## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MASSACHUSETTS

In re:

COMPREHENSIVE POWER, INC.

_____

In re:

JOSEPH H. BALDIGA, AS TRUSTEE FOR THE
BANKRUPTCY ESTATE OF COMPREHENSIVE
POWER, INC.; and BECANA CAPITAL,

      Plaintiffs,

      v.

MOOG, INC.; SEAN GARTLAND; CORMAC
CREAVEN, FRANKLIN B. JONES, FRANCIS S.
JONES, STUART A. JONES, and CHARLES N.
GRICHAR,

      Defendants.

Chapter 7

Case No. 14-40824-HJB

Adversary Proceeding No. _____

## ADVERSARY COMPLAINT

Plaintiffs, Joseph H. Baldiga, as the duly appointed and acting Chapter 7 Trustee for the

bankruptcy estate of Comprehensive Power, Inc. (the "*Debtor*"), and Becana Capital ("*Becana*"),

by and through their attorneys, hereby complain against the Defendants as follows:

## NATURE OF THE ACTION

1.    The Trustee, along with Becana as to certain but not all of the claims alleged

herein, brings this complaint against Moog, Inc. ("*Moog*"): (i) to recharacterize as equity any of

Moog's claims; (ii) alternatively, to equitably subordinate any of Moog's alleged claims pursuant

to 11 U.S.C. §510(c) to all other unsecured claims; (iii) to impose successor liability onto Moog

for the Debtor's existing debts; (iv) to recover for damages caused by Moog's violations of

Article 9 of the Uniform Commercial Code ("*UCC*"); (v) to recover damages caused by Moog's violations of Massachusetts General Law Chapter 93A ("*M.G.L. c. 93A*"); (vi) to avoid and recover transfers of property and money of the Debtor to Moog pursuant to, *inter alia*, sections 544(b), 548, and 550 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532, as amended (the "*Bankruptcy Code*") and the Massachusetts Fraudulent Transfer Act; and (vii) to recover damages caused by Moog having aided and abetted the Debtor's directors' various breaches of fiduciary duty as described herein.

2.      This Complaint also seeks relief against the Debtor's directors, including Defendant Sean Gartland ("*Gartland*"), and each of the remaining individual Defendants, for their various breaches of fiduciary duties which caused harm to the Debtor and, ultimately, to the Debtor's creditors.

## PARTIES

3.      Plaintiff Joseph H. Baldiga is the duly appointed and acting Chapter 7 Trustee for the bankruptcy estate (the "*Estate*") of the Debtor.

4.      Plaintiff Becana is the Debtor's largest unsecured creditor and is the holder of a general unsecured claim in the amount of $15,387,000 which is not contingent as to liability, and is not and cannot be subject to bona fide dispute as to amount or liability.[1]

5.      Upon information and belief, Defendant Moog is a New York corporation with its principal place of business at 400 Jamison Road, Elma, New York 14059.

6.      Upon information and belief, Defendant Gartland is a resident and/or citizen of the State of New York.  During relevant times, Gartland was one of the Debtor's directors.

---

[1] Becana holds claims for substantially greater amounts than $15,387,000.  Thus, Becana's current claimed amount of $15,387,000 is only the minimum of Becana's claim.

7.      Upon information and belief, at all relevant times, Defendant Cormac Creaven ("*Creaven*") was a director of the Debtor while the Debtor had its sole place of operations in Massachusetts.

8.      Upon information and belief, at all relevant times, Franklin B. Jones ("*Jones*") was a director of the Debtor while the Debtor had its sole place of operations in Massachusetts.

9.      Upon information and belief, at all relevant times, Defendant Francis S. Jones ("*Francis*") was a director of the Debtor while the Debtor had its sole place of operations in Massachusetts.

10.     Upon information and belief, at all relevant times, Defendant Stuart A. Jones ("*Stuart*") was a director of the Debtor while the Debtor had its sole place of operations in Massachusetts.

11.     Upon information and belief, at all relevant times, Defendant Charles N. Grichar ("*Grichar*") was a director of the Debtor while the Debtor had its sole place of operations in Massachusetts.

## PROCEDURAL BACKGROUND

12.     On April 22, 2014, certain of the Debtor's creditors (including Becana, as a petitioning creditor) filed an involuntary petition against the Debtor under Chapter 7 of the Bankruptcy Code.

13.     This Court entered an order for relief under Chapter 7 of the Bankruptcy Code against the Debtor on May 23, 2014.

14.     On May 23, 2014, the United States Trustee appointed Joseph H. Baldiga as the Chapter 7 trustee of this case.

## JURISDICTION

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1334(b).

16.     This matter is a core proceeding under 28 U.S.C. §§ 157(b)(2)(B), (F), (H), and

(O).  Pursuant to Fed. R. Bankr. P. 7008, Plaintiffs aver that this adversary proceeding relates to

Case Number 14-40824-HJB, *In re Comprehensive Power, Inc.*, in the United States Bankruptcy

Court for the District of Massachusetts, Central Division.  The Trustee consents to the entry of

final orders or judgment by the Bankruptcy Court.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a) as a civil

proceeding arising under Title 11 and related to a case under Chapter 7 that is pending in this

district.

## FACTUAL BACKGROUND

### *Brief History Of The Debtor*

18.     The Debtor is a Delaware corporation and during relevant times had its principal

place of business in Marlborough, Massachusetts.

19.     When it was operational, the Debtor designed and manufactured high-

performance permanent magnet motors, generators, controls, and drives, among other things.

The Debtor therefore engaged in trade and commerce in the Commonwealth of Massachusetts.

### *The Debtor Engages Moog For A Capital Infusion*

20.     In early 2013, the Debtor's investment banker identified Moog as a potential

lender or investor in, or acquirer of, the Debtor.  Moog moved quickly to pursue the deal.

Ultimately, the parties reached an agreement by which Moog would provide the Debtor with an

advance of $6,000,000.  As a material component of the deal, the Debtor purportedly gave Moog

an option to acquire the Debtor or its assets and provided Moog with a right to designate one of the board members of the Debtor.

21.     The deal was memorialized in a series of documents executed and delivered by the parties in April 2013.  Moog's $6,000,000 investment was memorialized through a promissory note ("*Note*") and option agreement ("*Option Agreement*"), genuine copies of which are attached as Exhibits A and B.  In relevant part, the Note provided for quarterly interest payments with a maturity date of April 12, 2016.

22.     Pursuant to the Option Agreement, Moog also purportedly was granted an option to purchase the Debtor's stock or assets at a purchase price equal to six times of EBITDA for the consecutive 12-month period preceding the exercise of the option.  The "option" was exercisable anytime between April 12, 2014 and April 11, 2016 (the "*Option Period*").

23.     If Moog exercised its option, then the Debtor would have been given an opportunity to negotiate in good faith the terms of an agreement to consummate Moog's acquisition.  Furthermore, if Moog exercised its option and chose to acquire the Debtor's stock, then the Option Agreement provided that *all of the Debtor's indebtedness would be paid at the time of closing* unless assumed by Moog.  Finally, the Option Agreement contemplated that if Moog exercised its option, then Moog would not disrupt the Debtor's business operations through the execution and delivery of any final acquisition agreement.

24.     The Note and Option Agreement also reflected the parties' understanding of what would be required for the Debtor to obtain alternative financing or other arrangements if Moog declined to exercise the purported option.  In relevant part, the parties agreed that if Moog did not exercise its option by October 12, 2015, then the Debtor would be entitled to extend the maturity date of the Note *for a full six months*, to and including October 12, 2016.

25.     While labeled a "loan," Moog's Note and Option Agreement were an atypical transaction that had all the indicia of an equity investment.  For example, Moog's standard practice was to engage in actual acquisitions, <u>not</u> loans, thereby indicating that Moog's ostensible "loan" to the Debtor was nothing more than the parties' attempt to structure a unique acquisition given the facts of the case.

26.     Moreover, Moog's novel Note and Option Agreement did not have the normal characteristics of a traditional loan because, among other things, and as noted above: (i) the Debtor was only required to make quarterly (as opposed to monthly) interest payments to Moog; (ii) Moog retained an option to purchase the Debtor's stock or assets; (iii) Moog secured and exercised the right to appoint a director to the Debtor's Board of Directors ("*Board*"); and (iv) Moog agreed to give the Debtor a six-month runway option (*i.e.*, time to find a "plan B" with additional financing) if Moog elected not to exercise its "option."

### *Moog Starts The Process Of Extracting Value From And Taking Control Of The Debtor*

27.     Moog eventually started to exercise its rights under the parties' arrangement. Specifically, and pursuant to the Option Agreement, Moog appointed Gartland to the Debtor's Board, and Gartland continued to serve as a director of the Debtor until September 2013.  At all relevant times that Gartland was a director of the Debtor, Gartland was also a Moog employee.

28.     Unfortunately, and unbeknownst to the Debtor, Gartland favored Moog's interests over those of the Debtor.  For example, Gartland prepared personal notes after appearing in his capacity as a Director of the Debtor at the Debtor's May 2013 Board meeting in Massachusetts. Those notes contain certain confidential issues relating to the Debtor's financial condition, which were disclosed to Gartland solely in his capacity as a director.  Gartland concedes in his notes that one of the follow up items from that Board meeting included "[g]et[ting] a commercial CPI-

Moog agreement in place and begin[ning] to *extract value for Moog*." (Emphasis added.)  A true and correct copy of Gartland's notes is attached hereto as <u>Exhibit C</u>.

29.    Gartland shared his personal notes with Moog executives, notwithstanding that the notes contained confidential financial and strategic information regarding the Debtor. Gartland, however, did not disclose to Jones, the Debtor's then-President, or to Charles Cuneo ("*Cuneo*"), the Debtor's-then Chief Executive Officer ("*CEO*"), that Gartland was revealing the Debtors' confidential information to Moog and recommending to Moog that it proceed to "extract value" from the Debtor.

30.    Gartland and Moog executives thereafter continued to implement Gartland's suggested plan of "extract[ing] value for Moog," but they did so without disclosing this plan and their secret activities to the key members of the Debtor's management or other Board members. For example, Gartland and Moog executives analyzed the Debtor's proposal to award stock, a proposal that was developed by the Debtor to address its concerns about employee retention. Instead of discussing how that proposal could impact the Debtor's bottom line, Gartland focused his analysis on whether the proposal would have "any adverse impact on Moog." Moog and Gartland secretly analyzed other of the Debtor's operational challenges, but Gartland admonished his Moog colleagues that they "should not share [those further analyses] with [the Debtor] at this time."

31.    Moog, through Gartland, also started to embed itself further into the Debtor's Marlborough, Massachusetts location and to inject itself into and attempt to manage the Debtor's day-to-day operations. By way of only limited example, Moog reviewed the Debtor's equipment designs, provided feedback on the viability of those designs, and worked closely with the Debtor to develop engineering solutions. Throughout that time period, Moog regularly sent

communications to the Debtor into Massachusetts to discuss certain aspects (but apparently not all) of the Debtor's operations.  Moog even sent its insider, Gartland, on at least one customer visit with Jones.  During that and other visits, Gartland and/or Jones attempted to reassure customers that Moog ultimately would be stepping in as the Debtor's successor to "continue the business."

32.      By August and September 2013, the Debtor's financial condition had worsened and management sought additional capital from Moog.  Faced with this financial situation, Moog elected not to wait until the period in which it could affirmatively decline its contractual "option" and thereby give the Debtor the opportunity to extend the Moog "loan" maturity date an additional six months.  Instead, and with knowledge of the Debtor's worsening financial condition, Moog sought and was successful in obtaining new and improved contractual rights which affirmatively deprived the Debtor of its ability to extend the Moog "loan" maturity date and therefore to potentially seek other financing sources.

33.      Specifically, on or around October 11, 2013 Moog and the Debtor executed a Collateral Surrender and Consent to Sale Agreement (the "*Surrender Agreement*").  By authorizing the execution of the Surrender Agreement, the Debtors' directors effectively abdicated their duties to Moog and surrendered control of the Debtor and its assets to Moog.

34.      Moreover, and although the parties had previously agreed to give the Debtor a six-month "runway" if Moog chose not to exercise its purported option, the Surrender Agreement deprived the Debtor of that right by requiring the Debtor to: (i) cease operations and turn over all cash accounts as soon as Moog decided it was time for the Debtor to do so (regardless of whether the Debtor had yet exercised its "runway" option); (ii) give Moog access to all books and records; (iii) accelerate all amounts due under the Moog loan; and (iv) ostensibly

waive a number of legal protections in connection with Moog's efforts to sell the Debtor's assets.

35.   Upon information and belief, at the time the Debtor executed the Surrender

Agreement, none of the Debtor's directors had solicited an independent valuation or opinion as

to the value of the Debtor's assets (*e.g.*, customer relationships, physical assets, or intellectual

property) to determine if those assets exceeded the amounts owed to Moog under the Note.

Upon information and belief, the directors also did not take steps to determine if there were

viable options to preserve the Debtor's value for its creditors and other stakeholders, which may

have included, among other things: (i) obtaining additional financing to maintain the Debtor as a

going concern; (ii) attempting to secure Moog's further cooperation to put Moog into the Option

Period, which would have allowed the Debtor to exercise its "runway" and therefore seek capital

from other third-parties (who were not going to insist on draconian contractual undertakings such

as the Surrender Agreement); or (iii) filing for bankruptcy at a time that would have been more

advantageous to the Debtor and its many creditors.

36.   After the Surrender Agreement was in place—and the Debtor had all but ensured

that Moog would consolidate its control over the Debtor and its Marlborough, Massachusetts-

based business—Moog escalated its efforts to control the Debtor.  Moog's purported lien on the

Debtor's assets at most would have allowed Moog to exercise its purported rights as a secured

creditor to liquidate the Debtor's assets at a secured party sale.  But this was not enough for

Moog.  Instead, Moog sought to leverage its lien on the Debtor's assets to continue the Debtor's

business and to acquire the going concern value of the Debtor and its advantageous relationships

with its customers.  Moog did so by, among other things, continuing to solicit and interfere with

the Debtor's relationships with its customers, and attempting to take those customers for Moog's

benefit.  To that end, *inter alia,* Moog created priorities for transitioning the Debtor's key

customers to Moog, and essentially directed the Debtor's employees to assist in that effort.

Moog also directed the material aspects of the Debtor's day-to-day Massachusetts-based

operations, such as the monitoring of cash flow and the approval of expense payments.

37.    Simply put, by October 2013, Gartland's plan to "extract value" was well

underway, and Moog had assumed pervasive and full control of the Debtor, its business, and its

financial affairs.

### *Moog Decides To Terminate The Debtor's Operations And Then Completes Its Takeover*

38.    On or around November 1, 2013, Moog sent to the Debtor at its Massachusetts

location a notice to terminate operations pursuant to the Surrender Agreement.  The notice

provided, among other things, that the Debtor was required to cease operations, surrender cash

collateral, and basically turn over to Moog the "keys to the castle" on or before November 11,

2013.  In other words, and contrary to the six-month runway in which the Debtor would have

been entitled to find a "plan B," the notice of termination gave the Debtor *a mere 10 days* to take

action.

39.    The Debtor terminated all of its employees on or around November 8, 2013,

consistent with Moog's demand and at Moog's direction.

40.    Moog then completed its succession to the Debtor's business by offering jobs to

at least 14 of the Debtor's former employees, including management-level employees such as the

Debtor's founder Frank Jones and CEO Charles Cuneo.  Upon information and belief, Moog

chose to and did focus its hiring efforts on those employees with unique skills such as design

engineers, manufacturing engineers, technicians, and production assembly people with a plan "to

set up a large facility in Marlborough[, Massachusetts] to manufacture" motors and products.

41.    Moog also solidified its role as the Debtor's successor by actively pursuing and

developing the Debtor's existing and prospective customer relationships with Becana, Evolution

Well Services, Lockheed Martin, Raytheon, and others.  Moog also continued to make

assurances to the Debtor's customers that Moog would be able to complete the Debtor's

obligations and would be using the Debtor's former employees to help accomplish the same.

42.    During this time, Moog continued to incur liabilities under the Debtor's name

even though Moog well knew that the Debtor was not going to survive, and likely could not

repay its debts in full (including those Moog incurred in the Debtor's name).

### _Moog Acquires The Debtor's Assets, But Fails To Use Commercially Reasonable Efforts To Do So_

43.    By written notice dated January 28, 2014, Moog gave notice of its intention to

conduct a secured party sale of the Debtor's equipment, inventory, patents, general intangibles,

and other personal property on February 11, 2014.  Again, and rather than the full six months to

which the Debtor may have otherwise had time to find alternative support, the Moog notice of

sale gave the Debtor about two weeks to try to do so.  Upon information and belief, Moog did

not take steps other than the absolute minimum it believed was required by Article 9 of the UCC

with respect to its purported secured party sale of the Debtor's assets.

44.    Moog also terminated the majority of the Debtor's former employees and, through

its new employee Jones, notified the Debtor's former customers that the Debtor (which was now

effectively operating under Moog's control) was winding down its operations and would cease

manufacturing activities as of January 30, 2014.  This notice was false—the Debtor was not

"winding down" its operations, but instead was operating solely under Moog's dominion and

control, and solely for the benefit of Moog.

45.    Moog was the sole bidder at the February 11, 2014 sale and credit bid

$2.1 million of its purported secured debt for _all of_ the Debtor's assets, even though just two

years earlier Moog had been willing to pay up to $10 million to acquire the Debtor, and the

parties had previously discussed valuing the Debtor's business between $12 million and

$24 million.

46.     As a result of its purported credit bid, Moog ostensibly acquired the Debtor's

entire business in exchange for a reduction of its loan by $2.1 million, and did so in a way that

deprived the Debtor of any chance it may have previously had to secure further support and find

alternate options for maintain its viability.

47.     None of the Debtor's creditors other than Moog received any benefit from the

sale.  In other words, by purporting to acquire the Debtor's entire business (and not just the

assets on which Moog purportedly held a security interest) through a secured party asset sale,

Moog was able to obtain at least a benefit of $2.1 million while the Debtor's other creditors were

left holding the empty shell of the Debtor's now-defunct and asset-less business.

## CLAIMS FOR RELIEF

### COUNT I
### RECHARACTERIZATION OF DEBT AS EQUITY
### (BY THE TRUSTEE AGAINST MOOG)

48.     The Trustee incorporates by reference Paragraphs 1 through 47 as if fully set forth

herein.

49.     At relevant times, the Debtor was undercapitalized and/or insolvent at least

because:

a.     The Debtor suffered losses between 2012 and 2013, and would have gone

bankrupt had it not received cash advances;

b.     The Debtor encountered cash flow problems beginning just months after

advances received from Becana and others, and was having trouble keeping pace with payments

owed to employees, vendors, and others;

- 12 -

c. Despite Moog providing a substantial capital infusion of $6,000,000 in April 2013, the Debtor depleted those monies within a few short months and was faced with an imminent need for further cash; and

d. The Debtor ostensibly defaulted on its obligations to Moog less than ten months after the April 2013 transaction.

50. The obligations of Moog were intended as equity, as evidenced by at least the following:

a. Moog's "loan" was not a typical loan for Moog. It was, at least according to Gartland's knowledge, the first—and only—of its kind for Moog.

b. Moog's "loan" with the Debtor had a number of unique terms, thereby demonstrating that it was not a traditional loan, but was instead intended to be a capital contribution. For example, and unlike a traditional loan: (i) the Debtor was only required to make quarterly interest payments to Moog, instead of monthly payments of principal and interest as is typical in loans from banks; (ii) Moog had an option to purchase the Debtor's stock or assets, which is not generally seen in loans from banks; (iii) Moog's "loan" to the Debtor gave Moog the right to appoint a director to the Debtor's Board, and Moog did in fact appoint Gartland as such a director; and (iv) the Debtor had a right to extend the Moog "loan" maturity date by six full months if Moog elected not to pursue its "option."

51. Upon information and belief, the following additional facts also demonstrate that the Moog "loan" was in fact a form of equity:

a. The Debtor's existing capital contributions were insufficient to sustain the Debtor's operations.

b. The Debtor was undercapitalized;

- 13 -

c.      The ultimate financial failure of the Debtor was caused by undercapitalization; and

d.      The Debtor could not obtain financing from other sources.

52.      Any of Moog's purported claims against the Debtor should be recharacterized as equity.

## COUNT II
## EQUITABLE SUBORDINATION OF DEBT
## PURSUANT TO 11 U.S.C. § 510(c)(1)
## (BY THE TRUSTEE AGAINST MOOG)

53.      The Trustee incorporates by reference Paragraphs 1 through 52 as if fully set forth herein.

54.      Moog's conduct described above and herein was wrongful, inequitable, and shocks the conscience in that Moog, among other things, planted a director on the Debtor's Board who then used his time (and the Debtor's financial information) to concoct and assist in executing a plan to "extract value for Moog."

55.      That conduct caused injury to the Debtor and its creditors, and allowed Moog to gain an unfair advantage over other creditors because it, among other things, expedited Moog's right to acquire all of the Debtor's assets (and to do so for a low price), and allowed Moog and/or the Debtor to avoid paying the Debtor's other creditors such as Becana.

56.      Equitable subordination of any of Moog's claims is therefore consistent with the provisions of the Bankruptcy Code, including Bankruptcy Code § 510(c).

## COUNT III
## AVOIDANCE OF RECOVERY OF ACTUAL FRAUDULENT TRANSFER PURSUANT
## TO 11 U.S.C. §§ 548(a)(1)(A)
## (BY THE TRUSTEE AGAINST MOOG)

57.      The Trustee incorporates by reference Paragraphs 1 through 56 as if fully set forth herein.

- 14 -

58.     All payments and transfers to Moog on account of Moog's alleged claims against the Debtor (including, without limitation, the Debtor's assets Moog purportedly acquired at the purported secured party sale) were transfers of one or more interests of the Debtor in property (the "*Transfers*"), that were made or incurred on or within two years before the date of the filing of the involuntary petition.

59.     All of the Transfers were made with actual intent to hinder, delay, or defraud one or more entities to which the Debtor was or became, on or after the date that such transfer was made, indebted.

60.     The Transfers are fraudulent transfers that the Trustee is entitled to avoid pursuant to 11 U.S.C. § 548(a)(1)(A).

## COUNT IV
## AVOIDANCE OF CONSTRUCTIVELY FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. § 548(a)(1)(B)
## (BY THE TRUSTEE AGAINST MOOG)

61.     The Trustee incorporates by reference Paragraphs 1 through 60 as if fully set forth herein.

62.     The Debtor received less than a reasonably equivalent value in exchange for the Transfers.

63.     The Debtor was insolvent on the date that such Transfers were made, or became insolvent as a result of such Transfers.

64.     The Debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the Debtor after the Transfers was an unreasonably small capital.

65.     The Debtor intended to incur, or the Debtor believed that it would incur, debts that would be beyond the Debtor's ability to pay as such debts matured at all relevant times (including, without limitation, at the time of the Transfers).

66.     The Transfers are fraudulent transfers that the Trustee may avoid pursuant to 11 U.S.C. § 548(a)(1)(B).

**COUNT V**
**AVOIDANCE OF ACTUALLY FRAUDULENT TRANSFERS**
**PURSUANT TO THE MASSACHUSETTS FRAUDULENT TRANSFER ACT**
**AND 11 U.S.C. § 544(b)**
**(BY THE TRUSTEE AGAINST MOOG)**

67.     The Trustee incorporates by reference Paragraphs 1 through 66 as if fully set forth herein.

68.     There existed and exists at least one or more creditors of the Debtor holding an unsecured claim that is allowable under section 502 of the Bankruptcy Code or that is not allowable only under section 502(e) of the Bankruptcy Code who may avoid the Transfers under applicable law, including, without limitation, under M.G.L. c.109A, §§ 5 and 6.

69.     All of the Transfers were made with actual intent to hinder, delay, or defraud any and all creditors of the Debtor.

70.     All of the Transfers were fraudulent transfers within the meaning of M.G.L. c.109A, § 5(a)(1) that the Trustee may avoid pursuant to 11 U.S.C. § 544(b).

**COUNT VI**
**AVOIDANCE OF CONSTRUCTIVELY FRAUDULENT TRANSFERS**
**PURSUANT TO THE MASSACHUSETTS FRAUDULENT TRANSFER ACT**
**AND 11 U.S.C. § 544(b)**
**(BY THE TRUSTEE AGAINST MOOG)**

71.     The Trustee incorporates by reference Paragraphs 1 through 70 as if fully set forth herein.

- 16 -

72.     The Debtor made the Transfers without receiving a reasonably equivalent value in exchange for the Transfers.

73.     At all relevant times, including at the times of the Transfers, the Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor after the Transfers were unreasonably small in relation to the business or transaction.

74.     At all relevant times, including at the times of the Transfers, the Debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

75.     All of the Transfers were fraudulent transfers within the meaning of M.G.L. c.109A, § 5(a)(2) that the Trustee may avoid pursuant to 11 U.S.C. § 544(b).

**COUNT VII**
**AVOIDANCE OF CONSTRUCTIVELY FRAUDULENT TRANSFERS**
**PURSUANT TO THE MASSACHUSETTS FRAUDULENT TRANSFER ACT**
**AND 11 U.S.C. § 544(b)**
**(BY THE TRUSTEE AGAINST MOOG)**

76.     The Trustee incorporates by reference Paragraphs 1 through 75 as if fully set forth herein.

77.     The Debtor made the Transfers without receiving a reasonably equivalent value in exchange for the Transfers.

78.     At all relevant times, including at the times of the Transfers, the Debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the Debtor after the Transfers were unreasonably small in relation to the business or transaction.

79.     At all relevant times, including at the times of the Transfers, the Debtor intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

80.     At all relevant times, including at the times of the Transfers, the Debtor was insolvent or the Debtor became insolvent as a result of the Transfers.

81.     All of the Transfers were fraudulent transfers within the meaning of M.G.L. c.109A, § 6(a) that the Trustee may avoid pursuant to 11 U.S.C. § 544(b).

## COUNT VIII
## RECOVERY OF AVOIDED TRANSFERS
## PURSUANT TO 11 U.S.C. § 550
## (BY THE TRUSTEE AGAINST MOOG)

82.     The Trustee incorporates by reference Paragraphs 1 through 81 as if fully set forth herein.

83.     Moog was the initial transferee of the Transfers and is therefore liable for the value of the Transfers.

84.     The Trustee is entitled to recover from Moog the property transferred in the Transfers, or value of the Transfers, pursuant to 11 U.S.C. § 550(a)(1).

## COUNT IX
## RECOVERY OF AVOIDED TRANSFERS PURSUANT TO
## M.G.L. c.109 §§ 8 and 9(b)
## (BY THE TRUSTEE AGAINST MOOG)

85.     The Trustee incorporates by reference Paragraphs 1 through 84 as if fully set forth herein.

86.     Moog is the first transferee of the Transfers and is the person for whose benefit the Transfers were made.

87.     The Trustee may avoid the Transfers to the maximum extent permitted pursuant to M.G.L. c.109A §§ 8(a)(1) and 9.

## COUNT X
## SUCCESSOR LIABILITY/*DE FACTO* MERGER
## (BY THE TRUSTEE AND BECANA AGAINST MOOG)

88.      The Trustee and Becana incorporate by reference Paragraphs 1 through 87 as if fully set forth herein.

89.      All creditors holding allowed claims, including Becana and the other petitioning creditors, have valid, existing, and indisputable claims against the Debtor and are owed substantial monies from the Debtor.

90.      Moog is obligated for those debts because Moog *de facto* merged with the Debtor and became the Debtor's alter ego on account of the matters averred herein.  Evidence of that *de facto* merger/alter ego includes the matters averred above and the following:

      a.      ***Evidence That Moog Intended To Continue The Debtor's Business Operations***

     i.      Moog hired employees of the Debtor on or around the same time that the Debtor ceased operations on or around November 8, 2013.

     ii.      Moog retained the Debtor's officers and managers to continue working for certain customers, with the understanding that those customers could potentially become Moog customers if Moog obtained the Debtor's assets and operated a large motor business out of the Debtor's facilities, but as a Moog company.

     iii.      The Debtor's CEO, Cuneo, became a Moog employee approximately one week after the Debtor ceased to operate independently, and Jones, the Debtor's President, became a Moog employee approximately two weeks after the Debtor ceased to operate independently.

     iv.      By mid-November, 2013, Moog had hired at least 14 of the Debtor's employees.

     v.      Upon information and belief, Moog saw no distinction between its interests and those of the Debtor, notwithstanding the obvious difference that Moog was a creditor, and that

Moog's interest to recover its investment was not the Debtor's sole, or perhaps even principal, interest.  The Debtor had duties to other creditors and stakeholders that Moog did not share, and that Moog ignored when it assumed pervasive control of the Debtor and its business.  Moog's control of the Debtor, and its activities that caused the Debtor to disregard, fail to perform, and ignore its competing obligations, illustrate that Moog ignored the differing interests of the Debtor and commandeered the Debtor's business (and not just its assets) solely to satisfy Moog's interest in recovering its purported "loan" to the detriment of the Debtor's other stakeholders and creditors.

        b.     ***Evidence That There Were In Fact Continuous Business Operations***

     i.      Gartland, as a Moog employee, acted in May 2013 to "extract value" from the Debtor, notwithstanding that Gartland was Moog's designee on the Debtor's Board.

     ii.     Moog thereafter expressed its intent to "pick up for-profit clients and continue the [Debtor's] business" notwithstanding that it "continued" the Debtor's business solely for Moog's benefit and to the detriment of the Debtor and its other creditors.

     iii.     In November 2013, Moog furthered its efforts to continue the Debtor's business by acquiring possession, custody, and control of the Debtor's assets apparently to start a Moog large motor business out of the Debtor's Marlborough facilities.

     iv.     Moog also made visits to certain of the Debtor's primary customers for, upon information and belief, the purpose of transitioning those customers to Moog.  For example, Gartland participated in meetings with the Debtor's customers, where it was discussed that "contracts with [the Debtor] would go away, but Moog would be willing to step in and offer Moog's products, Moog's designs, and that Moog would be hiring [the Debtor's] people, and [was] expected to gain control of CPI assets."

v.      Moog took numerous efforts to transition the Debtor's assets, technology, personnel, and customer relationships to Moog after the Debtor wound down.

c.      ***Evidence That Moog Controlled The Debtor's Operations From At Least The Fourth Quarter Of 2013 Through The February 2014 Asset Sale***

i.      Moog, in its capacity as creditor, controlled which of the Debtor's expenses would be paid and which would not be paid;

ii.      Cuneo, then a Moog (but no longer a Debtor) employee, provided weekly status reports to Moog employee Gary Parks, thereby facilitating Moog's analysis of and control over the Debtor's cash flow; and

iii.      Moog controlled the Debtor's dealings with its customers from approximately August 2013 to late January 2014, when Moog notified the Debtor's customers that Moog had severed its relationship with Jones and the Debtor.

91.      Simply put, there was a clear continuity of management, personnel, physical location, assets, and general business operations once Moog came into the fold, through and continuing after the Debtor shut its doors.  Indeed, Moog appears to have been well aware that its various business activities constituted a potential ground for imposing successor liability because Moog executives discussed as early as October 3, 2013 the need for Moog to attempt to conform its conduct to avoid a successor liability claim although, as alleged herein, Moog failed to do so. A true and correct copy of certain of Moog's correspondence on this issue is attached hereto as Exhibit D.

### COUNT XI
### VIOLATION OF ARTICLE 9 OF THE UCC
### (BY THE TRUSTEE AGAINST MOOG)

92.      The Trustee incorporates by reference Paragraphs 1 through 91 as if fully set forth herein.

93.    The public auction by which Moog sold the Debtor's assets was governed by the UCC.

94.    Accordingly, "[e]very aspect of a disposition of [the] collateral, including the method, manner, time, place, and other terms," was required to be commercially reasonable.

95.    Moog, however, failed to utilize the required commercially reasonable efforts with respect to every aspect of the process by which Moog sought to dispose of the Debtor's assets. By way of only limited example, Moog employed a process that was not intended to generate a reasonable sale price in that Moog: (i) did not, upon information and belief, adequately market the property; and (ii) was the only bidder at a sale conducted on a short 14-day notice. In addition, Moog's public auction was not commercially reasonable because it was simply a formality used by Moog to consolidate its control of the Debtor's business, and resulted in a sale price (the $2.1 million credit bid) that was, upon information and belief, substantially less than what the parties had previously valued the Debtor's business at, and less than what would have been paid had the Debtor's business and intellectual property been appropriately valued by an independent third party. Finally, Moog's efforts to acquire the Debtor's assets were not commercially reasonable because they, among other things, resulted from Moog having deprived the Debtor of a six-month runway option (notwithstanding the prior agreement of the parties which evidenced the parties' intent that the Debtor needed up to a full six months to find alternatives to Moog) and only giving the Debtor less than two weeks to find a "plan B."

96.    The Debtor was damaged by Moog's failure to adhere to the required commercially reasonable standards because, among other things, the defective public auction process was a sham used by Moog to consolidate its control of the Debtor's business, deprived other potential purchasers from acquiring the Debtor's assets, and effectively prevented the

Debtor's creditors from realizing the market value of the Debtor's assets (including its

intellectual property), and therefore resulted in a sale that deprived the Debtor of obtaining a

reasonably equivalent value for its assets and/or otherwise retaining sufficient assets to reimburse

the Debtor's other creditors.

**COUNT XII**
**VIOLATION OF M.G.L. c. 93A**
**(BY THE TRUSTEE AGAINST MOOG)**

97.     The Trustee incorporates by reference Paragraphs 1 through 96 as if fully set forth

herein.

98.     The parties have, at all relevant times, been engaged in the conduct of trade or

commerce in Massachusetts.

99.     At all relevant times, the wrongful actions, conduct, and methods described

herein—in other words, the center of gravity of the circumstances that give rise to this claim—

occurred primarily and substantially within the Commonwealth of Massachusetts.  Further, the

parties' written agreements, and their business together, concerned property and business

operations in Marlborough, Massachusetts, and the Debtor suffered losses to its property and

business in the Commonwealth of Massachusetts.

100.     In or about April 2013, Moog enticed the Debtor to execute the Note and Option

Agreement in Moog's favor by promising in writing that, among other things, the Debtor would

be entitled to extend the Moog "loan" maturity date by a full six months if Moog elected not to

exercise its "option."

101.     But Moog later decided it wanted to change that bargain, and did so by expediting

its ability to take over the Debtor's operations by executing with the Debtor a draconian

Surrender Agreement that forced the Debtor to give up its six-month runway option.

102.     Upon information and belief, Moog knowingly and willfully strong-armed the Debtor into signing the Surrender Agreement for the purpose of "extract[ing] value for Moog"; namely, forcing the Debtor to turn its clients and day-to-day operations over to Moog, and to allow Moog to acquire the Debtor's entire business for what was eventually a low-ball price (and before Moog had to give the Debtor any benefit from the six-month runway option and the Debtor had time to either get another plan in place or file for bankruptcy).

103.     Moog's wrongful actions, conduct, and methods, as described herein, constitute unfair and/or deceptive acts and/or practices in the conduct of trade or commerce in violation of M.G.L. c. 93A.

104.     Moog's wrongful actions, conduct, and methods, as described herein, have been willful and knowing violations of M.G.L. c. 93A.

105.     As a direct result of Moog's wrongful actions, conduct, and practices, the Debtor suffered losses to property and money as described herein.

**COUNT XIII**
**BREACH OF FIDUCIARY DUTY OF LOYALTY TO THE DEBTOR**
**(BY THE TRUSTEE AGAINST GARTLAND)**

106.     The Trustee incorporates by reference Paragraphs 1 through 105 as if fully set forth herein.

107.     As a director on the Debtor's Board, Gartland owed the Debtor fiduciary duties including the duty of loyalty.

108.     The duty of loyalty mandates that the best interests of the corporation and its shareholders take precedence over any interest possessed by a director, officer, or controlling shareholder and not shared by the stockholders generally.  In other words, the duty of loyalty required Gartland to put the interests of the Debtor above all else.

109.    Gartland, however, failed to exercise his duty of loyalty in that he, among other things, put Moog's interests before the Debtor's by failing to place the Debtor's interests in front of Moog's interests, as alleged herein, and by working as a Moog employee to facilitate a self-interested Moog acquisition of the Debtor's business wrongfully as alleged herein.

110.    Indeed, throughout his tenure on the Debtor's Board, Gartland was motivated not by a desire to serve the Debtor's best interests, but instead to accomplish Moog's acquisition of and/or integration with the Debtor on terms that were the most favorable to Moog and injurious to the Debtor and its creditors.

111.    Gartland's breaches of his fiduciary duties caused the Debtor to suffer damages.

<u>COUNT XIV</u>
<u>BREACH OF FIDUCIARY DUTY OF CARE TO THE DEBTOR</u>
**(BY THE TRUSTEE AGAINST GARTLAND)**

112.    The Trustee incorporates by reference Paragraphs 1 through 111 as if fully set forth herein.

113.    As a director on the Debtor's Board, Gartland owed the Debtor fiduciary duties including the duty of care.

114.    The duty of due care generally requires that directors both: (1) use that amount of care which ordinarily careful and prudent men would use in similar circumstances; and (2) consider all material information reasonably available.

115.    Gartland, however, did not adequately exercise his duty of care because Gartland did not keep himself fully informed and engaged as to the Debtor's operations and did not consider all material information reasonably available to him.  Instead, and among other things, Gartland's efforts as a director were limited to participating in one Board meeting, and thereafter working to benefit Moog to the detriment of the Debtor and its creditors.

- 25 -

116.    Gartland's breaches of his fiduciary duties caused the Debtor to suffer damages.

**COUNT XV**
**BREACH OF FIDUCIARY DUTY OF LOYALTY TO THE DEBTOR**
**(BY THE TRUSTEE AGAINST**
**CREAVEN, JONES, FRANCIS, STUART, AND GRICHAR)**

117.    The Trustee incorporates by reference Paragraphs 1 through 116 as if fully set forth herein.

118.    As directors on the Debtor's Board during relevant times, Creaven, Jones, Francis, Stuart, and Grichar (the "*Non-Gartland Directors*") owed fiduciary duties to the Debtor, including the duty of loyalty.

119.    The duty of loyalty mandates that the best interests of the corporation and its shareholders take precedence over any interest possessed by a director, officer, or controlling shareholder and not shared by the stockholders generally.  In other words, the duty of loyalty required the Non-Gartland Directors to put the interests of the Debtor first above all else.

120.    The Non-Gartland Directors, however, failed to exercise their duties of loyalty in that they, among other things, capitulated to Moog's interests even when those interests were not aligned with the Debtor.  By way of example, in October 2013, the Debtor's Non-Gartland Directors acquiesced to Moog's unreasonable (and very unfavorable) demands by permitting the Debtor to execute the Surrender Agreement.  That agreement contained a number of onerous and draconian provisions which essentially resulted in the Debtor giving its business away to Moog for no additional consideration.

121.    Moreover, the Non-Gartland Directors ignored the fact that surrendering the Debtor's entire business to Moog (and in some cases, ultimately accepting the benefit of employment with Moog even if only short-term) may have been solely in Moog's best interests, rather than in the Debtor's best interests.  Indeed, and upon information and belief, the Debtor

- 26 -

and its directors simply did that which was most favorable for Moog, rather than that which

might have been more favorable for the Debtor (which could have included, at the very least,

putting Moog into the Option Period so that the Debtor could exercise its rights to the six-month

runway option and have at least a chance to find a "plan B").

122.    The Non-Gartland Directors' breaches of their fiduciary duties of loyalty

therefore caused the Debtor to suffer damages.

<u>COUNT XVI</u>
<strong>BREACH OF FIDUCIARY DUTY OF CARE TO THE DEBTOR
(BY THE TRUSTEE AGAINST THE NON-GARTLAND DIRECTORS)</strong>

123.    The Trustee incorporates by reference Paragraphs 1 through 122 as if fully set

forth herein.

124.    As directors on the Debtor's Board, the Non-Gartland Directors owed the Debtor

fiduciary duties including the duty of care.

125.    The duty of due care generally requires that directors both: (1) use that amount of

care which ordinarily careful and prudent men would use in similar circumstances; and (2)

consider all material information reasonably available.

126.    The Non-Gartland Directors, however, did not adequately exercise their duty of

care because they did not keep themselves fully informed and engaged as to the Debtor's

operations or as to the material information reasonably available to them.  By way of example,

the Non-Gartland Directors failed to keep themselves fully apprised of Gartland's activities

(which were for the benefit of Moog, but to the detriment of the Debtor), notwithstanding that

they acquiesced to Moog's appointment of Gartland to the Debtor's Board.

127.    Upon information and belief, the Non-Gartland Directors also failed to keep themselves fully informed of material information relating to steps that could have conceivably been taken by the Board to protect the Debtor against Moog.

128.    The Non-Gartland Directors' breaches of their fiduciary duties caused the Debtor to suffer damages.

**COUNT XVII**
**AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY**
**(BY THE TRUSTEE AGAINST MOOG)**

129.    The Trustee incorporates by reference Paragraphs 1 through 128 as if fully set forth herein.

130.    Gartland and the Non-Gartland Directors owed the Debtor fiduciary duties including the duty of loyalty and duty of care.

131.    Gartland and the Non-Gartland Directors breached their various fiduciary duties as described herein and in Counts XIII through XVI.

132.    Moog knowingly participated in Gartland and the Non-Gartland Directors' breaches of their fiduciary duties in that, among other things, and as further described herein, Moog secretively exploited Gartland's conflicting interests, directed Gartland to assist Moog in "extract[ing] value" for itself, and facilitated the Non-Gartland Directors' execution of the Surrender Agreement all to the sole benefit of Moog and to the detriment of the Debtor and its creditors.

133.    Gartland and the Non-Gartland Directors' breaches of their fiduciary duties, and Moog's assistance with the same, caused the Debtor to suffer damages.

WHEREFORE, the Trustee and Becana pray as follows:

A.  That the Trustee recover judgment of and from Moog on account of Count I

recharacterizing any and all of Moog's claims and liens against the Debtor and its

assets as equity;

B.   That the Trustee recover judgment of and from Moog on account of Count II

equitably subordinating all of Moog's claims and liens against the Debtor and its

assets to the allowed claims of other creditors against the Debtor;

C.   That the Trustee recover judgment of and from Moog on account of Count III

avoiding the Transfers pursuant to 11 U.S.C. § 548(a)(1)(A);

D.   That the Trustee recover judgment of and from Moog on account of Count IV

avoiding the Transfers pursuant to 11 U.S.C. § 548(a)(1)(B);

E.   That the Trustee recover judgment of and from Moog on account of Count V

avoiding the Transfers pursuant to 11 U.S.C. § 544(b) and M.G.L. c.109A, § 5(a)(1);

F.   That the Trustee recover judgment of and from Moog on account of Count VI

avoiding the Transfers pursuant to 11 U.S.C. § 544(b) and M.G.L. c.109A § 5(a)(2);

G.   That the Trustee recover judgment of and from Moog on account of Count VII

avoiding the Transfers pursuant to 11 U.S.C. § 544(b) and M.G.L. c.109A § 6(a);

H.   That the Trustee recover judgment of and from Moog on account of Count VIII for

the property transferred in the Transfers, or value of the Transfers, pursuant to 11

U.S.C. § 550(a)(1);

I.   That the Trustee recover judgment of and from Moog on account of Count IX to the

maximum extent permitted pursuant to M.G.L. c.109A §§ 8(a)(1) and 9;

J.   That Becana and the Trustee recover judgment of and from Moog on account of

Count X finding and determining that Moog is liable for all claims and debts of the

Debtor as Moog's successor pursuant to, *inter alia,* theories of *de facto* merger and

- 29 -

alter ego, in an amount determined at trial;

K.  That the Trustee recover judgment of and from Moog on account of Count XI in an amount determined at trial for Moog's failure to act in a commercially reasonable manner as required by Article 9 of the UCC with respect to the Transfers;

L.  That the Trustee recover judgment of and from Moog on account of Count XII pursuant to M.G.L. c. 93A in an amount up to three times the Trustee's actual damages, plus the Trustee's attorneys' fees and costs;

M.  That the Trustee recover judgment of and from Gartland on account of Count XIII in an amount determined at trial;

N.  That the Trustee recover judgment of and from Gartland on account of Count XIV in an amount determined at trial;

O.  That the Trustee recover judgment of and from the Non-Gartland Directors on account of Count XV in an amount determined at trial;

P.  That the Trustee recover judgment of and from the Non-Gartland Directors on account of Count XVI in an amount determined at trial;

Q.  That the Trustee recover judgment of and from Moog on account of Count XVII in an amount determined at trial;

R.  That Becana and the Trustee be awarded costs, plus pre-judgment and post-judgment interest to the maximum amount permitted by law; and

S.  That Becana and the Trustee be awarded such other and further relief to which they may be entitled.

Dated:  March 30, 2016                              Respectfully submitted,

                                                    */s/ Jeffrey D. Sternklar*
                                                    Jeffrey D. Sternklar (BBO #549561)

- 30 -

JEFFREY D. STERNKLAR LLC
225 Franklin Street, 26th Floor
Boston, MA 02110
Phone: (617) 733-5171
Fax: (617) 507-6530
Email: jeffrey@sternklarlaw.com

By:  */s/ Paul E. Chronis*
Paul E. Chronis (*pro hac vice* in Case No. 14-
40824-HJB, prospective *pro hac vice* in this
adversary proceeding)
Elinor H. Murárová (prospective *pro hac vice* in
this adversary proceeding)
DUANE MORRIS LLP
190 S. LaSalle Street, Suite 3700
Chicago, IL 60603
Phone: (312) 499-6700
Fax: (312) 499-6701
Email: pehchronis@duanemorris.com
            ehart@duanemorris.com