**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**CENTRAL DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | Case No. 14-40824-CJP |
| COMPREHENSIVE POWER, INC., | ) | |
| | ) | |
| Debtor | ) | |
| | ) | |
| | ) | |
| JOSEPH H. BALDIGA, AS TRUSTEE | ) | |
| FOR THE BANKRUPTCY ESTATE OF | ) | |
| COMPREHENSIVE POWER, INC., AND | ) | AP No. 16-04023-CJP |
| BECANA CAPITAL, | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MOOG, INC., SEAN GARTLAND, | ) | |
| CORMAC CREAVEN, FRANKLIN B. | ) | |
| JONES, FRANCIS S. JONES, STUART | ) | |
| A. JONES, AND CHARLES N. | ) | |
| GRICHAR, | ) | |
| | ) | |
| Defendants | ) | |
| | ) | |

**MEMORANDUM OF DECISION**

Before the Court is the Motion to Dismiss (the "Motion") filed by Moog, Inc. (the

"Defendant" or "Moog"), pursuant to which Moog seeks to dismiss Counts I through XII of a

seventeen-count complaint (the "Complaint") brought by Joseph H. Baldiga (the "Trustee"), as

Chapter 7 Trustee for the bankruptcy estate of Comprehensive Power, Inc. (the "Debtor"), and

Becana Capital ("Becana," together with the Trustee, the "Plaintiffs"). In the Complaint, the

1

Plaintiffs seek, among other things, to: (i) re-characterize as equity "any" of Moog's claims; (ii) equitably subordinate any such claims pursuant to 11 U.S.C. § 510(c)[1]; (iii) avoid and recover transfers of property and money of the Debtor to Moog pursuant to §§ 544(b), 548, and 550 of the Bankruptcy Code and §§ 5–6 and 8–9 of Massachusetts General Law ("M.G.L.") ch. 109A, the Massachusetts Uniform Fraudulent Transfer Act (the "UFTA"); (iv) impose successor liability for the Debtor's existing debts on Moog on the basis of de facto merger and alter ego theories; (v) recover damages for violation of the commercial reasonableness requirement for a secured party sale under Article 9 of the Uniform Commercial Code ("UCC"); and (vi) recover damages for violation of M.G.L. ch. 93A.[2] All counts against Moog are brought solely by the Trustee except Count X, which seeks to impose successor liability, with respect to which Becana is a co-plaintiff with the Trustee.

Moog contends that dismissal of Counts I through XII is warranted because the Plaintiffs have failed to plead sufficient facts that state facially plausible claims for relief with respect to each of the counts. Moog argues that it is merely a non-insider creditor that extended a loan to the Debtor after the parties executed financing documents memorializing the transaction, which included a security agreement granting Moog a security interest in substantially all assets of the Debtor. Moog asserts that it later enforced its rights as a secured creditor after the Debtor's

---

[1] Unless otherwise noted, all section references herein are to Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended (the "Bankruptcy Code").

[2] In addition to Counts I through XII, the Complaint also contains another count against Moog, which is not subject to the Motion. Count XVII seeks damages against Moog for aiding and abetting breaches of fiduciary duty by the directors and officers ("D&O") of the Debtor, which D&O claims are set forth in Counts XIII through XVI of the Complaint.

default in accordance with the transaction documents and applicable law.

The Plaintiffs assert that the allegations contained in the Complaint, if taken as true, would demonstrate that the transaction was not a "loan," but rather a mechanism by which Moog improperly acquired the Debtor's business for substantially less than fair value at the expense of the Debtor's creditors. According to the Plaintiffs, the Debtor was undercapitalized, if not insolvent, at the time of the loan; the transaction was "atypical" of both a traditional lender-borrower financing transaction and the types of transactions in which Moog was usually involved; and the loan was part of a larger scheme by Moog to acquire the business of the Debtor for significantly less than it was worth.

After a hearing on the Motion and consideration of the written and oral arguments of the parties, including the supplemental briefing regarding equitable subordination submitted at the Court's direction, and for the reasons set forth below, the Court grants the Motion in part, dismissing Count II, and denies the Motion in part as to Counts I and III–XII because the Plaintiffs allege sufficient facts in their Complaint to demonstrate plausible claims for relief with respect to those counts.

## I.    <u>Facts and Procedural History</u>

The following facts are taken as alleged in the Complaint and from associated exhibits,[3]

---

[3] The Plaintiffs attached the following exhibits to their Complaint: a promissory note dated April 12, 2013 (Ex. A); an option agreement dated April 12, 2013 (Ex. B); May 31, 2013 board meeting notes prepared by Sean Gartland (Ex. C); and emails between Moog employees (Daniel Foster, Sean Gartland, Dennis Webster, Gary Parks, and Ari Almqvist) dated March 10, 2013 and October 3-4, 2013 (Ex. D). *See* Compl. Exs. A–D. Moog attached various additional documents to its Motion, consisting of: a general security agreement dated April 12, 2013 (Ex. 1); a collateral surrender and consent to sale agreement dated October 11, 2013 (Ex. 2); and a UCC-1 financing statement filed by Moog regarding the Debtor's personal property (Ex. 3). *See* Mot. Exs. 1–3. In their opposition to the Motion, the Plaintiffs object to the inclusion of the additional exhibits because they are not a part of the Complaint, but conclude that, "[i]n

3

and must be accepted as true and construed in Plaintiffs' favor by the Court in considering the

Motion.

The Debtor, a Delaware corporation, at all relevant times had its principal place of

business in Marlborough, Massachusetts. Compl. ¶ 18. Among other things, it designed and

manufactured high-performance permanent magnet motors, generators, controls, and drives. *Id.* ¶

19.

Early in 2013, the Debtor's investment banker identified Moog as a lender to, investor in,

or purchaser of the Debtor. *Id.* ¶ 20. In April 2013, the Debtor obtained funds in the amount of

$6 million from Moog, which transaction the parties memorialized in a series of documents

dated April 12, 2013, including a promissory note ("Note"), security agreement ("Security

Agreement"), and option agreement ("Option Agreement"). *Id.* ¶ 21, Exs. A–B; Mot. Ex. 1.

Pursuant to the Security Agreement, the Debtor granted Moog a security interest in substantially

all of the Debtor's personal property and, upon an event of default under the Note, the right to

pursue remedies available at law, including those available under the UCC. Mot. Ex. 1, §§ 2,

6(a).

---

any event, Moog's new documents do not justify dismissal." Pls.' Opp'n 2 n.1. The Plaintiffs do not
challenge the authenticity of the exhibits to the Motion or whether they are pertinent to the Complaint,
such that the Court may consider the documents without transforming the Motion into a motion for
summary judgment. *See, e.g., Beddall v. State Street Bank and Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998)
("When, as now, a complaint's factual allegations are expressly linked to—and admittedly dependent
upon—a document [offered by the movant] (the authenticity of which is not challenged), that document
effectively merges into the pleadings and the trial court can review it."); *Fudge v. Penthouse Int'l., Ltd.*,
840 F.2d 1012, 1015 (1st Cir. 1988) (quoting 5 C. Wright & A. Miller, FEDERAL PRACTICE AND
PROCEDURE § 1327 at 489 (1969)) ("Although 'there is no requirement that the pleader attach a copy of
the writing on which his action or defense is based[,] . . . when plaintiff fails to introduce a pertinent
document as part of his pleading, defendant may introduce the exhibit as part of his motion attacking the
pleading'").

The Plaintiffs state that Moog "drafted and insisted upon using deal documents that superficially mimic, at least in part, documents that ordinarily appear as part of traditional loan transactions" but allege that their terms belied a typical "true" loan and "laid bare the real 'M&A' aspects of the deal" providing, among other things, that: (i) under the Note, the Debtor was only required to make quarterly, rather than monthly, interest payments at 4.5% to Moog and (ii) pursuant to the Option Agreement, (a) Moog retained an option to purchase the Debtor's stock or assets for a base cash payment equal to six times EBITA at any time between April 12, 2014 and April 11, 2016 (the "Option Period"); (b) Moog had the ability to appoint a director to the Debtor's Board of Directors ("Board"); and (c) the Debtor could extend the Note's maturity date for six months to October 12, 2016, if Moog declined to exercise its purchase option by October 12, 2015. Compl. ¶¶ 22–26, Ex. B.

Pursuant to the Option Agreement, if the option was exercised, the parties would negotiate the terms of a definitive acquisition agreement in good faith and Moog would not disrupt the Debtor's business before consummation of the transfer. *Id.* ¶ 23, Ex. B. The Option Agreement also provides that, within 90 days of its execution and delivery, Moog and the Debtor would execute a separate commercial agreement in a form mutually agreeable to the parties, pursuant to which the Debtor would develop and produce Moog-brand products using the Debtor's technology. *Id.* Ex. B, §§ E, 2.2.

Moog appointed Sean Gartland ("Gartland"), its employee, to serve as a director on the Debtor's Board, and he served in that capacity until September 2013. *Id.* ¶ 27. As a member of the Board, Gartland received confidential information about the Debtor's financial affairs, and the Plaintiffs allege that Gartland favored Moog's interests above the Debtor's. *Id.* ¶¶ 28–31.

5

Specifically, the Plaintiffs allege that, after a May 2013 Board meeting, Gartland prepared and shared with Moog, without disclosing to key members of the Debtor's management or other Board members, personal notes containing confidential information relating to the Debtor's financial condition and strategy. *Id*. ¶¶ 27–29. Gartland's Board meeting notes included, as a follow up item to the May 2013 meeting, "[g]et[ting] a commercial CPI-Moog agreement in place and begin[ning] to extract value for Moog." *Id*. ¶¶ 27–29, Ex. C.

The Plaintiffs allege in their Complaint that Gartland and Moog engaged in activities to "extract value" from the Debtor for Moog. Specifically, the Plaintiffs allege that Gartland shared the Debtor's confidential information with Moog executives, without the Debtor's knowledge, and used that information to advance Moog's interests. *Id*. ¶ 30. Further, the Plaintiffs allege that Gartland injected himself into the Debtor's operations, including reviewing equipment designs and going on at least one customer visit, during which the customer was informed that Moog would be stepping in as the Debtor's successor to "continue the business." *Id*. ¶ 31.

By August and September 2013, the Debtor's financial condition had worsened and management sought additional capital from Moog.  *Id*. ¶ 32.  " Despite Moog [having provided] a substantial capital infusion of $6,000,000 in April 2013, the Debtor [had] depleted those funds within a few short months and was faced with an imminent need for further cash." *Id*. ¶ 49(c). Ultimately, "[t]he Debtor [] defaulted on its obligations to Moog less than ten months after the April 2013 transaction." *Id*. ¶ 49(d). The Plaintiffs allege that at this time Moog began to take steps beyond simply liquidating the Debtor's assets for the repayment of its loan in order to assume possession and control of the Debtor's assets consistent with its true intention to leverage its lien position to acquire all of the Debtor's ongoing business and its advantageous relationships

6

for less than fair value without paying the Debtor's creditors. *Id.* ¶¶ 32–47.

On or about "October 11, 2013[,] Moog and the Debtor executed a Collateral Surrender and Consent to Sale Agreement ("Surrender Agreement")." *Id.* ¶ 33. Through the Surrender Agreement, the Plaintiffs contend that Moog effectively had assumed control over virtually every aspect of the Debtor's business. In authorizing the execution and delivery of the Surrender Agreement, the Plaintiffs also allege that the Debtor's directors abdicated their responsibilities and breached their duties, thereby ensuring "that Moog would consolidate its control over the Debtor." *Id.* ¶¶ 33, 34, 36.

Among other things, the Surrender Agreement accelerated all amounts due to Moog under the Note and required the Debtor to cease operations, turnover all cash accounts upon demand to Moog, and provide Moog with access to all of the Debtor's books and records. *Id.* ¶ 34. On November 1, 2013, Moog sent the Debtor a notice to terminate operations pursuant to the Surrender Agreement, directing the Debtor to cease operations and surrender possession by November 11, 2013. *Id.* ¶ 38; Mot. Ex. 2. The Plaintiffs allege that the Surrender Agreement also operated to deprive the Debtor of its potential six-month "runway" to find additional financing or take other measures. *Id.* ¶¶ 26, 34. The Plaintiffs point to this short ten-day window for the Debtor to take action with respect to repayment as supporting their allegation that Moog did not act as a traditional lender. *Id.* ¶ 38.

On November 8, 2013, the Debtor terminated all of its employees. Moog later offered jobs to at least fourteen of the Debtor's former employees, including some at management-level and others with unique technical skills. *Id.* ¶¶ 39–40. Among the former employees who accepted positions with Moog were the Debtor's founder, Frank Jones, and CEO, Charles Cuneo.

*Id*. ¶ 40. The Plaintiffs allege, upon information and belief, that Moog planned to set up a large manufacturing facility in Marlborough, Massachusetts for production of motors and products similar to the Debtor's business. *Id*. The Plaintiffs also allege that, during this transition, Moog "pursu[ed] and develop[ed] the Debtor's existing and prospective customer relationships with Becana, Evolution Well Services, Lockheed Martin, Raytheon, and others[, and] continued to make assurances to the Debtor's customers that Moog would be able to complete the Debtor's obligations [] using the Debtor's former employees to help accomplish [that task]." *Id*. ¶ 41. Additionally, the Plaintiffs allege that at certain times Moog controlled which expenses of the Debtor would be paid, monitored the Debtor's cash flow, and continued to incur liabilities under the Debtor's name. *Id*. ¶¶ 36, 42.

On January 28, 2014, Moog notified the Debtor of its intent "to conduct a secured party sale of [its collateral, including] equipment, inventory, patents, general intangibles, and other personal property[, by public auction] on February 11, 2014." *Id*. ¶ 43. Moog, through Jones, "notified the Debtor's former customers that the Debtor (which was now effectively operating under Moog's control) was winding down its operations and would cease manufacturing activities as of January 30, 2014." *Id*. ¶ 44.

On February 11, 2014, Moog conducted a secured party sale at which it was the sole bidder, submitting a credit bid of $2.1 million for all assets of the Debtor. *Id*. ¶ 45. The Plaintiffs contend that Moog acquired all of Debtor's assets for less than fair value and that the secured party sale was not conducted in a commercially reasonable manner. *Id*. ¶¶ 43–47. The Plaintiffs allege that Moog had been willing to purchase the Debtor for $10 million two years prior to the UCC sale. *Id*. ¶ 45. The Plaintiffs further allege that the parties had discussed valuing the

8

Debtor's business between $12 million and $24 million. *Id.*

On April 22, 2014, certain of the Debtor's creditors, including Becana, filed an involuntary petition against the Debtor. The Court entered an order for relief under Chapter 7 of the Bankruptcy Code on May 23, 2014. The Office of the United States Trustee subsequently appointed the Trustee as the Chapter 7 Trustee of the Debtor. In its Schedules, the Debtor listed Moog as holding a disputed, contingent, and unliquidated claim. Moog has not filed a proof of claim in this case and the bar date has expired.[4]

## II.   Analysis

### a.  Standard of Review

Rule 8 of the Federal Rules of Civil Procedure ("Civil Rules"), made applicable to this proceeding by Bankruptcy Rule 7008, requires only that a complaint contain "a short and plain statement of the grounds for the court's jurisdiction[;] a short and plain statement of the claim showing that the pleader is entitled to relief; and [] a demand for the relief sought." Fed. R. Civ. P. 8(a)(1)–(3). When fraud is pleaded, Civil Rule 9(b) requires a plaintiff to plead fraud with particularity, but that standard is relaxed when such claims are brought by a trustee who must plead from second-hand knowledge. *See* Fed. R. Civ. P. 9(b) (providing that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake[; m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally"); *Gowan v. Patriot Grp., LLC (In re Dreier LLP)*, 452 B.R. 391, 408 (Bankr. S.D.N.Y. 2011) (holding "[f]or claims brought by a bankruptcy trustee, courts take a more liberal view when

---

[4]  Additionally, the Trustee has not filed a claim on behalf of Moog pursuant to Rule 3004 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules").

examining allegations of actual fraud . . . in the context of a fraudulent conveyance, since a

trustee is an outsider to the transaction who must plead fraud from second-hand knowledge")

(internal quotations and citations omitted).

In order to survive a motion to dismiss under Civil Rule 12(b)(6), made applicable to this

proceeding by Bankruptcy Rule 7012, a complaint must state a claim upon which relief can be

granted. *See* Fed. R. Civ. P. 12(b)(6). Allegations contained in the Complaint "must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554,

570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged." *Id.* (citing *Twombly*, 550 U.S. at 556); *see also Watterson v. Page*, 987 F.2d 1, 3 (1st

Cir. 1993) (holding that, in the context of a motion to dismiss under Civil Rule 12(b)(6), "a court

must take the allegations in the complaint as true and must make all reasonable inferences in

favor of the plaintiffs" to determine whether there are sufficient facts to show entitlement to

relief).

"[F]actual allegations must be enough to raise a right to relief above the speculative

level." *Twombly*, 550 U.S. at 555. "[B]ald assertions, unsupportable conclusions, periphrastic

circumlocutions, and the like need not be credited." *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir.

1996). "Determining whether a complaint states a plausible claim for relief will . . . be a context-

specific task that requires the . . . court to draw on its judicial experience and common sense."

*Iqbal*, 556 U.S. at 679.

The focus of a Civil Rule 12(b)(6) inquiry "is not whether plaintiff[] will ultimately

10

prevail, but whether [it is] entitled to offer evidence to support [its] claims." *Day v. Fallon Cmty.*

*Health Plan, Inc.*, 917 F. Supp. 72, 75 (D. Mass. 1996). Dismissal is appropriate if a plaintiff's

allegations do not "possess enough heft to show that plaintiff is entitled to relief." *Ruiz Rivera v.*

*Pfizer Pharm., LLC*, 521 F.3d 76, 84 (1st Cir. 2008) (internal quotation marks and original

alterations omitted). The Court should not attempt to forecast a plaintiff's likelihood of success

on the merits; "a well-pleaded complaint may proceed even if . . . a recovery is very remote and

unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted); *see also id.* at 563 n. 8

("[W]hen a complaint adequately states a claim, it may not be dismissed based on a district

court's assessment that the plaintiff will fail to find evidentiary support for his allegations or

prove his claim to the satisfaction of the factfinder."). The relevant inquiry focuses on the

reasonableness of the inference of liability that the plaintiff is asking the court to draw from the

facts alleged in the complaint. Sufficient pleading "[does] not require heightened fact pleading of

specifics, but only enough facts to state a claim to relief that is plausible on its face." *Ocasio-*

*Hernandez v. Fortuño-Burset*, 640 F.3d 1, 8 (1st Cir. 2011) (quoting *Twombly*, 550 U.S. at 570).

### b. Count I: Recharacterization

In Count I of the Complaint, the Trustee has brought a claim against Moog requesting

relief in the form of the equitable remedy of recharacterization. Although the Bankruptcy Code

does not expressly provide for the recharacterization of claims, the parties do not dispute the

general proposition that a bankruptcy court has authority to recharacterize a purported loan

transaction as an equity contribution.[5] Moog argues that the Trustee has failed to plead sufficient

---

[5] Circuit courts that have considered the issue have upheld the bankruptcy court's authority to
recharacterize claims pursuant to the broad powers afforded a bankruptcy court under § 105(a), and
bankruptcy courts within this District have similarly recognized such authority in determining

facts to support a claim for recharacterization, while recognizing that such an analysis is a fact-intensive inquiry for which "[n]o mechanistic scorecard suffices." *SubMicron*, 432 F.3d at 456.

"A bankruptcy court may recharacterize debt as equity where a 'creditor has contributed capital to a debtor in the form of a loan, but the loan has the substance and character of an equity contribution.'" *Crawford v. Riley Law Grp. LLP (In re Wolverine, Proctor & Schwartz, LLC),* 527 B.R. 809, 832 (D. Mass. 2015) (quoting *AtlanticRancher*, 279 B.R. at 433). "In a recharacterization analysis, if the court determines that the advance of money is equity and not debt, the claim is recharacterized and the effect is subordination of the claim 'as a proprietary interest because the corporation repays capital contributions only after satisfying all other obligations of the corporation.'" *AutoStyle*, 269 F.3d at 748–49 (quoting Matthew Nozemack, *Making Sense Out of Bankruptcy Courts' Recharacterization of Claims: Why Not Use § 501(c) Equitable Subordination*, 56 Wash. & Lee L. Rev. 689, 719 (1999)). Recharacterization of a claim is appropriate where the circumstances show that an apparent debt transaction was actually an equity contribution *ab initio*. *See, e.g., AutoStyle*, 269 F.3d at 747–48.

While there is no controlling precedent in the First Circuit, courts generally employ a multi-factor test to determine if recharacterization is appropriate. *See, e.g., Wolverine*, 527 B.R. at 832 (collecting cases). As noted by the Third Circuit Court of Appeals, such "an overarching inquiry [enables the court] to discern whether the parties called an instrument one thing when in

---

recharacterization claims. *See, e.g., Fairchild Dornier GmbH v. Official Comm. of Unsecured Creditors (In re Dornier Aviation (N. Am.), Inc.)*, 453 F.3d 225, 231 (4th Cir. 2006); *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 455 (3d Cir. 2006); *Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 748 (6th Cir. 2001); *Riley v. Tencara, LLC (In re Wolverine, Proctor & Schwartz, LLC)*, 447 B.R. 1, 24 (Bankr. D. Mass. 2011); *Aquino v. Black (In re AtlanticRancher, Inc.)*, 279 B.R. 411 (Bankr. D. Mass. 2002).

fact they intended it as something else." *SubMicron*, 432 F.3d at 456. The parties' intent is

inferred "from what the parties say in their contracts, from what they do through their actions

and from the economic reality of the surrounding circumstances. Answers lie in facts that confer

context case-by-case." *Id.*

In considering factors relevant to the recharacterization analysis and allegations in the

Complaint relating thereto, the Court has utilized the factors identified by the Third and Fourth

Circuits for the reasons set forth in *Wolverine*. *See* 447 B.R. at 30 ("The Fourth Circuit's focus

on whether the transaction is 'arms-length based on a multi-factor approach in *Dornier Aviation*,

or the Third Circuit's "overarching inquiry" as to intent in *SubMicron* permit a more thorough

evaluation of the substance of the challenged loan and the parties' intent than the rule espoused

by the Eleventh Circuit in *N & D Properties*."). These factors are:

> (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the
> presence or absence of a fixed maturity date and schedule of payments; (3) the
> presence or absence of a fixed rate of interest and interest payments; (4) the source
> of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of
> interest between the creditor and the stockholder; (7) the security, if any, for the
> advances; (8) the corporation's ability to obtain financing from outside lending
> institutions; (9) the extent to which the advances were subordinated to the claims
> of outside creditors; (10) the extent to which the advances were used to acquire
> capital assets; and (11) the presence or absence of a sinking fund to provide
> repayments.

*Dornier*, 453 F.3d at 233 (quoting *AutoStyle*, 269 F.3d at 749–50). "None of these factors is

dispositive and their significance may vary depending upon circumstances." *Dornier*, 453 F.3d at

234 (quoting *Sender v. Bronze Group, Ltd. (In re Hedged–Invs. Assocs., Inc.)*, 380 F.3d 1292,

1298–99 (10th Cir. 2004)).

Here, drawing reasonable inferences in his favor, the Trustee has pleaded sufficient facts

in support of at least six of the recharacterization factors, sufficiently stating a plausible claim for recharacterization of Moog's debt. While the Trustee admits that the names given to the documents align with traditional naming constructs for financial instruments, he argues that, overall, there were components of the transaction that revealed its true nature to be equity rather than debt. With respect to the recharacterization factors, the Trustee points to allegations relating to the presence or absence of a fixed maturity date and schedule of payments and the presence or absence of a fixed rate of interest and interest payments to support his contention that the terms of the instruments and circumstances of the transaction were "atypical." Specifically, the Trustee alleges: (i) Moog's standard practice was to engage in acquisitions, not provide loans, thereby indicating that Moog was implementing a unique "loan-to-own" transaction rather than establishing a true lender-borrower relationship; (ii) monthly interest payments were outside of the norm; (iii) the Debtor could extend maturity if the option was not exercised by Moog in connection with the Option Agreement; and (iv) Moog obtained substantive rights in the context of the transaction which are not typically given to traditional lenders, such as the right to appoint a representative to the Debtor's Board and an option to acquire the Debtor's assets or stock. Compl. ¶¶ 24–26, 50.

With respect to the source of repayments, the Trustee alleges that parties contemplated that the Moog financing could be repaid through Moog's acquisition of the Debtor's assets or stock, which could potentially support a claim for recharacterization. *Id.* Exs. A–B. As to the adequacy or inadequacy of capitalization, the Trustee alleges that the Debtor was undercapitalized and/or insolvent during relevant times, including at the time of the Surrender Agreement. *Id.* ¶¶ 32–34. The Trustee supports the allegation that the Debtor was

14

undercapitalized and/or insolvent by further alleging that the Debtor (i) suffered losses in 2012 and 2013 that would have bankrupted the Debtor if it did not receive cash advances; (ii) encountered cash flow problems just months after receiving "advances" from Becana and others; (iii) had "trouble keeping pace with payments owed to employees, vendors and others"; (iv) depleted the $6 million in funding received from Moog in just a few months; and (v) defaulted on obligations to Moog less than ten months after the financing transaction. *Id.* ¶ 49. Whether evidence supporting these allegations could contradict the Trustee's theories regarding the value of the Debtor's business at the time of the transactions with Moog is a consideration that is more appropriately addressed when the record has been developed.

Regarding the Debtor's ability to obtain financing from outside lending institutions, the Trustee alleges that the Debtor encountered cash flow problems and required further cash only months after receiving $6 million from Moog, suggesting the Debtor would be unlikely to obtain a traditional loan because of its cash flow issues. *Id.* ¶¶ 49, 51. The Trustee further alleges that no sinking fund was available to the Debtor to provide repayments, which Moog acknowledges, but argues is a "neutral" factor with respect to recharacterization. Mot. ¶ 61.

In sum, taken together, the factual allegations and the inferences drawn in favor of the Trustee are sufficient to state a plausible recharacterization claim. Additionally, while the Court recognizes that Moog has not filed a proof of claim, the filing of a claim by Moog is not necessary under the circumstances of this case for the Trustee to assert a recharacterization claim, which is an equitable remedy consistent with this Court's authority under § 105(a) to determine the nature and extent of the Debtor's obligations to Moog in the context of the fraudulent conveyance and other related claims asserted by the Trustee. The Court must

15

determine whether transfers made to Moog by the Debtor were transfers on account of "true" indebtedness or a disguised equity investment.[6] Accordingly, the Motion is denied as to this Count.

### c. Count II: Equitable Subordination under § 510(c)(1)

Count II alleges that Moog's conduct has resulted in injury to creditors of the Debtor and conferred an unfair advantage to Moog in violation of § 510(c)(1). Section 510(c) provides:

(c) . . . after notice and a hearing the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of an allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

11 U.S.C. § 510(c).

---

[6] The Court recognizes that some courts outside this jurisdiction have held that, without a proof of claim having been filed, there is no "claim" to recharacterize. *See, e.g., O'Connell v. Arthur Andersen LLP (In re AlphaStar Ins. Grp. Ltd.)*, 383 B.R. 231, 276 (Bankr. S.D.N.Y. 2008); *Gold v. Winget (In re NM Holdings Co.)*, 407 B.R. 232, 289 (Bankr. E.D. Mich. 2009). In the context of objections to proofs of claim, a number of courts of appeals have held that a federal rule of decision governs debt recharacterization where a proof of claim has been filed, following the Sixth Circuit's reasoning in *AutoStyle*, 269 F.3d at 749–50. *See, e.g., Dornier*, 453 F.3d at 231; *SubMicron*, 432 F.3d at 454–55. *AutoStyle* found authority for federal courts to recharacterize debt as equity under § 105(a), which gives bankruptcy judges the authority to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code, 269 F.3d at 748 (quoting § 105(a)), while other courts have held that a court's authority to recharacterize arises from § 502 and the claims allowance process, *see, e.g., Grossman v. Lothian Oil, Inc. (In re Lothian Oil, Inc.)*, 650 F.3d 539 (5th Cir. 2011) (holding that courts must define claims by reference to state law, and are thus required to recharacterize purported "debt" as equity where state law would treat the asserted interest as an equity interest, refocusing the underpinnings of the recharacterization doctrine from § 105 to the claims allowance process under § 502(b)). The Supreme Court recently granted, then dismissed, a petition for certiorari in *PEM Entities v. Levin* in which the Court could have resolved this split of authority with respect to recharacterization in the context of an objection to a proof of claim. *See PEM Entities LLC v. Province Grande Olde Liberty, LLC (In re Province Grande Olde Liberty, LLC)*, 655 F. App'x 971 (4th Cir. 2016), *cert. granted sub nom. PEM Entities LLC v. Levin*, 137 S. Ct. 2326 (2017), *and cert. dismissed as improvidently granted sub nom. PEM Entities LLC v. Levin*, No. 16-492, 2017 WL 3429146 (U.S. Aug. 10, 2017).

"The essential purpose of equitable subordination is to undo any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of distribution of the estate." *In re Mid–Am. Waste, Inc.*, 284 B.R. 53, 68 (Bankr. D. Del. 2002) (citing *Burden v. U.S.*, 917 F.2d 115, 117 (3d Cir. 1990)). The First Circuit Court of Appeals has adopted the standards for equitable subordination articulated by the Fifth Circuit in *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692 (5th Cir. 1977). *See Merrimac Paper Co., Inc. v. Harrison (In re Merrimac Paper Co., Inc.)*, 420 F.3d 53, 59 (1st Cir. 2005).

In order to exercise the power of equitable subordination, a court must find that: (1) the creditor engaged in some type of inequitable conduct or fraud, (2) such conduct resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the creditor, and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code. *See Mobile Steel Co.*, 563 F.2d at 699–700; *Merrimac Paper Co.*, 420 F.3d at 59; *Capitol Bank & Trust Co. v. 604 Columbus Ave. Realty Trust (In re 604 Columbus Ave. Realty Trust)*, 968 F.2d 1332, 1359–60 (1st Cir. 1992). "Misconduct is a prerequisite and determined on a case-by-case basis and conduct that shocks the conscience of the court is required." *Wolverine*, 447 B.R. at 44 (internal citations omitted). "While a bankruptcy court's recharacterization decision rests on the *substance of the transaction* giving rise to the claimant's demand, its equitable subordination decision rests on its assessment of *the creditor's behavior*." *Dornier*, 453 F.3d at 232. Although the two claims result in similar economic consequences, they are separate and distinct causes of action. *See AtlanticRancher*, 279 B.R. at 433. The Trustee contends that "any of Moog's claims" should be equitably subordinated pursuant to § 510(c), including any claim that may be filed if the Trustee ultimately succeeds on any of the fraudulent

transfer claims it has brought against the Debtor. *See* Compl. ¶ 56; Pls.' Suppl. Br. 4.

In its Motion, Moog argues that the Trustee had not pleaded sufficient facts to demonstrate that its conduct was inequitable and shocks the conscience. At the hearing on the Motion and in its further briefing on the equitable subordination count, Moog also argued that it has not filed any claim against the Debtor and, therefore, there is no claim to subordinate and no relief available to the Trustee under the plain language of § 510(c), which specifically references subordination of an "allowed" claim for distribution purposes. *See* 11 U.S.C. § 510(c)(1). The Trustee counters that the fraudulent transfer claims in Counts III through VIII and the equitable subordination claim in Count II are based on the same intertwined operative facts and that by allowing them to go forward together, this Court can consider all claims "in the interest of prudence and judicial economy," citing *Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*, 310 B.R. 500, 513 (Bankr. S.D.N.Y. 2002). Pls.' Suppl. Br. 3–4; *Gredd*, 310 B.R. at 513 (holding that as the "factual basis for this [equitable subordination] claim is closely entwined with the factual bases of Count I [fraudulent conveyance] . . . in the interest of prudence and judicial economy, the Court will consider the issue in conjunction with the Trustee's other claims").

"[However, t]he great weight of authority is that '[§] 510(c) does not permit subordination absent an allowed claim.'" *Dreier*, 452 B.R. at 451 (quoting *Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox, Inc.)*, 429 B.R. 73, 109 (Bankr. S.D.N.Y. 2010)). While the factual basis may overlap, the request for subordination is premature, at best, given that Moog has filed no "claim" and no "distribution" is contemplated to Moog that could be subordinated. The Trustee's contention that Moog could assert a claim under Bankruptcy Rule

18

3002(c)(3) upon entry of a final judgment in the Trustee's favor on any of the fraudulent transfer

counts, providing a claim to be preemptively subordinated should the Trustee also prevail on

Count II, is too speculative a proposition. This is particularly true where Moog has stated that it

has no intention of filing a claim and is willing to stipulate it will waive its right to do so. Def.'s

Suppl. Br. ¶ 9 n.3.[7]

The Motion is therefore granted as to Count II, and such count shall be dismissed without

prejudice to the Trustee seeking to pursue an equitable subordination claim pursuant to § 510(c)

if Moog ultimately files any claim.[8]

### d.   Counts III–IX: Avoidance Claims and Recovery of Avoided Transfers

The Complaint contains numerous counts seeking to avoid "all payments and transfers"

to or on behalf of Moog (the "Transfers"), including the transfer of assets to Moog "at the

purported secured party sale" as being fraudulent under §§ 544(b) (applying M.G.L. ch. 109A,

§§ 5 and 6) and 548. Compl. ¶ 58 (defining transfers in the Complaint as follows: "[a]ll

payments and transfers to Moog on account of Moog's alleged claims against the Debtor

(including, without limitation, the Debtor's assets Moog purportedly acquired at the purported

secured party sale) were transfers of one or more interests of the Debtor in property"). To the

extent avoided, the Trustee also seeks to recover the Transfers or the value of such Transfers

---

[7] Even in the *Gredd* case relied on by the Trustee to support his judicial economy argument, the Court noted that "[t]he [t]rustee has offered to withdraw Count IV [the equitable subordination count] if the defendant] agrees to stipulate that it will not claim back in the event of a recovery under Count I [the fraudulent conveyance count]. Absent such stipulation, [the] Court's determination of Count I either ripens or eliminates Count IV." 310 B.R. at 513.

[8] Given Moog's position with respect to dismissal of Count II, however, it appears Moog has waived its right to file a claim should the Trustee prevail on his remaining claims.

pursuant to § 550 and M.G.L. ch. 109A, §§ 8 and 9. The Trustee asserts that the Transfers

effected by Moog through its secured party sale constituted fraudulent conveyances that depleted

the Debtor's assets to the detriment of the Debtor's creditors.

Section 548(a)(1) of the Bankruptcy Code provides that a trustee may avoid any transfer

of a debtor's interest in property made within two years before the filing of a bankruptcy petition

if the transfer was actually or constructively fraudulent. 11 U.S.C. § 548(a)(1). Section 548(a)(1)

recognizes as fraudulent those transfers made by a debtor with actual intent to hinder, delay or

defraud creditors, as well as any transfer that is deemed to be constructively fraudulent because it

was made for less than reasonably equivalent value when a debtor is, or is rendered, insolvent,

undercapitalized, or unable to pay its debts as they become due. *See Max Sugarman Funeral

Home, Inc. v. A.D.B. Inv'rs*, 926 F.2d 1248, 1254 (1st Cir. 1991) ("The transfer of any interest in

the property of a debtor, within [the applicable statutory period] of the filing of a petition in

bankruptcy, is voidable by the trustee in bankruptcy if the purpose of the transfer was to prevent

creditors from obtaining satisfaction of their claims against the debtor by removing the property

from their reach."); *Richardson v. United States (In re Anton Noll, Inc.)*, 277 B.R. 875, 878

(B.A.P. 1st Cir. 2002). "The Trustee carries the burden of proving each of the [associated]

elements [under § 548(a)(1)] by a preponderance of the evidence." *Tri-Star Techs. Co. v.

Pitocchelli (In re Tri-Star Techs. Co., Inc.)*, 260 B.R. 319, 323 (Bankr. D. Mass. 2001).

With respect to avoiding fraudulent transfers made with "actual" intent, "[t]he trustee

may avoid any transfer . . . of an interest of the debtor in property . . . made or incurred on or

within 2 years before the date of the filing of the petition, if the debtor . . . made such transfer . . .

with actual intent to hinder, delay or defraud" any creditor. 11 U.S.C. § 548(a)(1)(A). Actual

20

fraudulent transfer claims pursuant to § 548(a)(1)(A) generally must satisfy the pleading requirements of Civil Rule 9(b) and turn on the intent of a debtor. *See In re Indrescom Sec. Tech. Inc.*, 559 B.R. 305, 317 (Bankr. D.P.R. 2016); *Gredd*, 310 B.R. at 505 (finding "[t]he operative requirement for a transfer to be avoided under this section is the debtor's actual fraudulent intent"). To adequately plead such a claim under Civil Rule 9(b), a complaint must allege with particularity "(1) the property subject to the transfer, (2) the timing and, if applicable, frequency of the transfer and (3) the consideration paid with respect thereto." *Pereira v. Grecolas Ltd. (In re Saba Enters., Inc.)*, 421 B.R. 626, 640 (Bankr. S.D.N.Y. 2009). While not eliminating the particularity requirement entirely, some courts "have taken a more liberal view when examining allegations of actual fraud that are [pleaded] by a bankruptcy trustee in the context of a fraudulent conveyance" given the second-hand nature of a trustee's knowledge. *Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369, 395 (Bankr. S.D.N.Y. 2007) (quoting *Picard v. Taylor (In re Park S. Sec., LLC)*, 326 B.R. 505, 517–18 (Bankr. S.D.N.Y. 2005)) (internal quotations omitted); *see also, e.g., Devaney v. Chester*, 813 F.2d 566, 569 (2d Cir. 1987) (stating that the relaxed standard does not eliminate the particularity requirement, although the degree of particularity required should be determined in light of circumstances such as opportunity for discovery); *Indrescom*, 559 B.R. at 317 (noting "if the trustee is the one that is asserting the actual fraudulent transfer claim, some courts have adopted a more liberal view because the trustee is an outsider to the transaction who must plead fraud from second hand knowledge"). "'[T]he trustee must show that the debtor had an intent to interfere with creditors' normal collection processes or with other affiliated creditor rights for personal or malign ends.'" *Indrescom*, 559 B.R. at 317 (quoting 5 COLLIER ON BANKRUPTCY ¶

21

548.04[1][a] (16th ed. 2016)).

Because direct evidence of fraudulent intent is often unavailable, courts usually rely on circumstantial evidence to infer fraudulent intent and have developed certain "badges of fraud" to establish actual intent to hinder, delay, or defraud creditors under § 548. *See Max Sugarman Funeral Home*, 926 F.2d at 1254–55. The First Circuit has set out five factors to assess fraudulent intent:

> (1) actual or threatened litigation against the debtor; (2) a purported transfer of all or substantially all of the debtor's property; (3) insolvency or other unmanageable indebtedness on the part of the debtor; (4) a special relationship between the debtor and the transferee; and, *after the transfer*, (5) retention by the debtor of the property involved in the putative transfer.

*Id*. at 1254 (internal citations omitted). While the presence or absence of any single badge of fraud is not conclusive, "the confluence of several [of these factors] can constitute conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." *Id*. at 1254–55.

To assert a "constructively" fraudulent transfer claim under the Bankruptcy Code,[9] the

---

[9] Section 548(a)(1)(B) provides:

> (a) (1) The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
> . . .
> (B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or
> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

Trustee must allege facts demonstrating that:

> 1) the debtor received less than reasonably equivalent value in exchange for the transfer made or obligation incurred; and 2) the debtor (a) was insolvent at the time the transfer was made or obligation incurred or became insolvent as a result thereof, (b) was engaged in or about to engage in a business or a transaction for which its remaining property constituted an unreasonably small capital, or (c) intended to incur, or believed it would incur, debts beyond its ability to pay as those debts matured.

*Tri-Star,* 260 B.R. at 323 (citing § 548(a)(1)(B)). Accordingly, the Trustee must have alleged facts sufficient to allow the court to draw a reasonable inference that the Debtor did not receive "reasonably equivalent value" for the purported transfers. *See* 11 U.S.C. § 548(a)(1)(B).

The Trustee also asserts claims under § 544(b), which permits the avoidance of transfers that would be voidable under applicable state law by a creditor holding an unsecured claim that is allowable under § 502 or that is not allowable only under § 502(e). *See id.* at § 544(b). The "applicable state law" pursuant to which the Trustee brings his § 544(b) claim to avoid the Transfers is the UFTA as adopted in Massachusetts, M.G.L. ch. 109A, §§ 5(a) and 6(a).[10] The

---

11 U.S.C. § 548(a)(1)(B).

[10] Specifically, M.G.L. ch. 109A, § 5, provides:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> (ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

M.G.L. ch. 109A, § 5. In addition, M.G.L. ch. 109A, § 6 provides in pertinent part:

23

UFTA is similar to § 548 of the Bankruptcy Code, and it applies to transfers that are fraudulent as to present and future creditors.

With respect to both §§ 5 and 6 of M.G.L. ch. 109A, the Trustee carries the burden of proving each element of by a preponderance of the evidence. *See Lassman v. Reilly, Jr. et al. (In re Feeley)*, 429 B.R. 56, 62 (Bankr. D. Mass. 2010).

In determining actual intent under paragraph (1) of subsection (a), consideration may be given, among other factors, to whether:

(1) the transfer or obligation was to an insider;
(2) the debtor retained possession or control of the property transferred after the transfer;
(3) the transfer or obligation was disclosed or concealed;
(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) the transfer was of substantially all the debtor's assets;
(6) the debtor absconded;
(7) the debtor removed or concealed assets;
(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

---

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

(b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

M.G.L. ch. 109A, § 6.

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

M.G.L. ch. 109A, § 5(b). For purposes of § 5(b)(5), an "asset" is defined as "property of a

debtor," but the term does not include property encumbered by a valid lien. *Id*. § 2

The analysis of what constitutes "reasonably equivalent value" under the relevant

sections of the Massachusetts UFTA mirrors the analysis of "reasonably equivalent value" under

11 U.S.C. § 548, *see Tri–Star, 260 B.R. at 324; Riley v. Countrywide Home Loans Inc. et al. (In*

*re Duplication Mgmt., Inc.)*, 501 B.R. 462, 481–84 (Bankr. D. Mass. 2013), which has been

described as follows:

> [C]ourts have uniformly held that a reasonably equivalent value determination should be based on all of the facts and circumstances of the case. The Court should "compare what was given with what was received." And, in making this determination, both direct and indirect benefits should be considered. It is not necessary that there be an exact exchange in order to establish reasonably equivalent value, but the Court "must keep the equitable purposes of the statute firmly in mind, recognizing that any significant disparity between the value received and the obligation assumed . . . will have significantly harmed . . . innocent creditors.

*Tri–Star*, 260 B.R. at 325–26 (internal citations omitted).

The allegations in the Complaint are sufficient to state plausible claims that the Transfers

to Moog were both "constructively" and "actually" fraudulent, although it is a closer

determination regarding whether the Trustee pleaded sufficient facts to state a plausible claim

with respect to the "actual" fraudulent conveyance counts.

Where actual fraudulent transfer claims are asserted by a trustee, pleading standards for

fraud are more liberal, even though such latitude does not extinguish the particularity

requirement entirely. *See, e.g., Indrescom*, 559 B.R. at 317.[11] The Trustee generally alleges that

all payments and transfers of property to Moog are avoidable as having been actually fraudulent,

focusing his specific allegations on the transfer of the Debtor's assets at the secured party sale,

facts and circumstances from which the Court could draw an inference that Moog's intent should

be imputed to the Debtor and that Moog intended to transfer assets to hinder delay or defraud the

Debtor's creditors. Specifically, the Trustee alleges that "by October 2013," presumably at or

after the time the Debtor executed and delivered the Surrender Agreement, Moog had assumed

"pervasive and full control of the Debtor." Compl. ¶¶ 33, 37. The Trustee further alleges that the

Moog-installed director acted for Moog's benefit and undertook efforts to extract value from the

Debtor for Moog, such that there some connecting allegations that would enable the Court to

impute Gartland and Moog's collective intent to the Debtor in order to demonstrate the *Debtor's*

actual intent to hinder, delay, or defraud creditors. *Id.* ¶¶ 27–33, 36–37, 45–47; *cf. In re Roco

Corp.*, 701 F.2d 978, 984 (1st Cir. 1983) (finding fraudulent intent of stockholder may be

imputed to debtor-transferor in context of stock redemption transaction because as the

company's president, director, and sole shareholder, stockholder was in a position to control the

disposition of the debtor's property). The Trustee alleges generally that Moog engaged in a "loan

to own" strategy to acquire all of the Debtor's ongoing business and its advantageous

relationships for less than fair value without paying the Debtor's creditors.  Compl. ¶¶ 32–47. The

Trustee also alleges that the Debtor's directors abdicated their responsibilities and breached their

duties in authorizing the execution and delivery of the Surrender Agreement and thereby "the

---

[11] In addition, see discussion at 21 *supra*.

Debtor had all but ensured that Moog would consolidate its control over the Debtor." *Id.* ¶¶ 33–36. Taken together, with reasonable inferences drawn in his favor, the Trustee has alleged sufficient facts to state a plausible claim that Moog's intent should be imputed to the Debtor through its "control" and that the Debtor was complicit in the transfer of its assets in relinquishing rights and facilitating a purported secured party sale. While it is unclear whether the Trustee will be able to prove these claims or the related "alter ego" theory pursued under Count X of the Complaint, the Trustee has at least met the pleading standard for these claims. Accordingly, the Court denies the Motion as to the § 548(a)(1)(A) count (Count III) and related state law count (Count V) of the Complaint.

As to the "constructive" fraudulent conveyance claims, the Trustee has alleged sufficient facts to support a claim that Moog effected a "voluntary" or involuntary transfer of the Debtor's assets for less than fair and reasonably equivalent consideration at a time when the Debtor was insolvent or rendered insolvent. *Id.* ¶¶ 32, 34, 38, 55. Without deciding whether Civil Rule 9(b), rather than Civil Rule 8(a), applies to constructive fraud claims under state law and the Bankruptcy Code, the Court concludes that, under either pleading standard, the Complaint sufficiently pleads insolvency to survive Moog's Motion and allow discovery to proceed on these counts. As such, the Court shall deny the Motion as to dismissal of the § 548(a)(1)(B) count (Count IV) and related state law counts (Counts VI and VII) of the Complaint.[12]

### e.  Count X:   Successor Liability and Alter Ego Claims

---

[12] As the counts related to avoidance of fraudulent transfers under §§ 544(b), applying M.G.L. ch. 109A, §§ 5 and 6, and 548 of the Bankruptcy Code survive, so too do the related counts pursuant to § 550(a) (Count VIII) and M.G.L. ch. 109A, §§ 8–9 (Count IX) associated with recovery of such transfers or the value of any such transfers.

Massachusetts courts generally do not impose the liabilities of a corporation upon a purchaser of its assets, but there are narrow exceptions to this general rule.[13] To ensure the "fair remuneration of innocent corporate creditors," four exceptions to this foundational principle of corporate law have developed where "'(1) the successor expressly or impliedly assumes liability of the predecessor, (2) the transaction is a de facto merger or consolidation, (3) the successor is a mere continuation of the predecessor, or (4) the transaction is a fraudulent effort to avoid liabilities of the predecessor.'" *Milliken & Co. v. Duro Textiles, LLC*, 887 N.E.2d 244, 254–55 (Mass. 2008) (quoting *Guzman v. MRM/Elgin*, 567 N.E.2d 929, 931 (Mass. 1991)). "When analyzing a claim for successor liability under theories of 'de facto merger' or 'mere continuation' of the predecessor, [the Court's] focus is on whether one company has become another for the purpose of eliminating its corporate debt." *Id.* at 254.[14]

In determining whether de facto merger has occurred, courts generally consider four factors:

> whether (1) there is a continuation of the enterprise of the seller corporation so that there is continuity of management, personnel, physical location, assets, and general business operations; whether (2) there is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation;

---

[13]  Both parties have cited to Massachusetts law as the operative law applicable to Count X. The Court will assume, without ruling, that Massachusetts law applies.

[14]  Moog did not address the alter ego claim in Count X separately, assuming that such claim was instead the Plaintiffs' "attempt[] to claim Moog is a mere continuation of the Debtor." Mot. ¶ 90. The dichotomy Moog attempts to draw between de facto merger and mere continuation, however, is a distinction without a difference because, while the de facto merger and mere continuation "labels have been enshrined separately in the canonical list of exceptions to the general rule of no successor liability, they appear, in practice to refer to the same concept[,], and courts have often used the two terms interchangeably." *Nat'l Gypsum Co. v. Cont'l Brands Corp.*, 895 F. Supp. 328, 336 (D. Mass. 1995) (internal citation omitted).

whether (3) the seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; and whether (4) the purchasing corporation assumes those obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.

*DeJesus v. Park Corp.*, 530 F. App'x 3, 6 (1st Cir. 2013) (quoting *Cargill, Inc. v. Beaver Coal & Oil Co.*, 676 N.E.2d 815 (Mass. 1997)). "[T]he Supreme Judicial Court of Massachusetts has repeatedly instructed that no single factor [of these four] is necessary or sufficient to establish a de facto merger." *DeJesus*, 530 F. App'x at 6 (internal quotations omitted). Additionally, the First Circuit Court of Appeals has specifically concluded that summary judgment cannot be based exclusively on the absence of continuity of ownership. *See id.* at 7; *see also Cargill*, 676 N.E.2d at 819 (holding that "there is no requirement that there be complete shareholder identity between the seller and a buyer before corporate successor liability will attach").

In addition to a de facto merger theory, the Plaintiffs also seek to impose liability on Moog for debts of the Debtor under an alter ego theory. Under Massachusetts law, a claim may be brought against the alter ego of a corporation when

there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or . . . when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting

*My Bread Baking Co. v. Cumberland Farms, Inc.*, 233 N.E.2d 748, 752 (Mass. 1968).

The Plaintiffs contend that the allegations that support their de facto merger successor liability theory also support their alter ego theory. While there is no allegation that there was a continuity of shareholders between the Debtor and Moog, the Plaintiffs allege there was

29

continuity with respect to employees, as Moog offered employment to at least fourteen of the

Debtor's former employees, including management-level employees. Compl. ¶¶ 39–40. The

Plaintiffs also allege that, upon information and belief, Moog planned to set up a large

manufacturing facility in Marlborough, Massachusetts for production of motors and products

similar to the Debtor's business and "pursu[ed] and develop[ed] the Debtor's existing and

prospective customer relationships with Becana, Evolution Well Services, Lockheed Martin,

Raytheon, and others [and] continued to make assurances to the Debtor's customers that Moog

would be able to complete the Debtor's obligations and would be using the Debtor's former

employees to help accomplish that task." *Id*. ¶¶ 40–41. The Plaintiffs further allege that Moog-

related Board member Gartland attempted to "extract value" for Moog and that the secured party

sale was the culmination of Moog's efforts to transition the Debtor's business, and not just its

assets, to Moog. *Id*. ¶¶ 28–30, 90. Additionally, the Plaintiffs allege that Moog controlled which

expenses of the Debtor would be paid and continued to incur liabilities under the Debtor's name.

*Id*. ¶¶ 36, 42. Based on the foregoing allegations, viewed in the light most favorable to the

Plaintiffs, and considering the First Circuit's admonition with respect to de facto merger claims

that, while continuity of shareholders/stock ownership can be a substantial component regarding

a successor liability claim, "no single factor is necessary or sufficient to establish a de facto

merger" and "that summary judgment cannot be based exclusively on the absence of continuity

of ownership," the Plaintiffs have sufficiently pleaded a successor liability claim in their

Complaint to survive Moog's Motion.[15]  *DeJesus*, 530 F. App'x at 6–7.

---

[15] In its Motion, Moog relied on the District Court's decision in *DeJesus*, stating that "[t]he Court held
that the plaintiff's inability to demonstrate that any former . . . shareholders became shareholders of [the
acquiring entity] was dispositive," Mot. ¶ 103, curiously relegating to a footnote the First Circuit's

Additionally, based on the allegations (i) regarding the continuity of business enterprise necessary to establish a de facto merger claim, (ii) that Moog controlled the Debtor from at least the fourth quarter of 2013 through the UCC sale, and (iii) that such control caused injury, the Plaintiffs have pleaded sufficient facts with respect to their alter ego theory as well. While "case law makes it clear that any departure from the traditional corporate law principle that the liabilities of a selling predecessor corporation are not imposed on a purchaser, let alone the acquirer of assets at a secured party sale under the Uniform Commercial Code, is an extraordinary remedy," *Riley v. Lexmar Global Inc. (In re Progression, Inc.)*, 559 B.R. 8, 24 (Bankr. D. Mass. 2016), given no one factor is determinative with respect to a successor liability claim and that the claims encompassed in Count X, whether based on a de facto merger or alter ego theory, are fact-intensive, the Plaintiffs have alleged sufficient facts to state plausible claims at this stage to allow the Plaintiffs to elicit further evidence on this Count.

Moog also argues that the Trustee, one of the co-Plaintiffs with respect to Count X, should be dismissed for lack of standing to assert the claim.[16]  In support, Moog relies on the general rule that "a trustee may only assert those claims that belong to [a] debtor," and that "the Debtor could not pursue an[y] alter ego or successor liability claims against itself on the date of its bankruptcy petition and, therefore, the Trustee is prevented from pursuing such claims now."

---

decision on appeal in which it found that "the district court's statement that a de facto merger does not occur absent a showing that there is a continuity of shareholders, was a stretch too far, and summary judgment cannot be based exclusively on the absence of continuity of ownership." Mot. ¶ 103 n.14; *DeJesus*, 530 F. App'x at 7 (internal quotations and citations omitted).

[16] Moog does not dispute, however, that Becana would have standing to bring a successor liability claim against Moog.

Mot. ¶¶ 86–87. The Trustee responds that such "general rule is 'easily circumvented' . . . where a

bankruptcy trustee . . . is attempting to resolve derivative claims (e.g. breaches of fiduciary duty,

recharacterization, equitable subordination, and fraudulent transfers) on behalf of a bankrupt

corporation which 'are properly the property of the estate,'" citing *Morley v. Ontos, Inc. (In re*

*Ontos, Inc.)*, 478 F.3d 427, 433 (1st Cir. 2007), as well as *Butler v. Moore*, Civ. No. 10-10207,

2015 WL 1409676, at *67 (D. Mass. Mar. 26, 2015) (noting that "[u]nder normal circumstances,

a corporation cannot disregard its own corporate form for its own benefit" but that "there is no

reason why the equitable doctrine of corporate disregard cannot be employed as necessary to

achieve a just result" where the claims at issue are for breaches of fiduciary duty rather than

avoidance of liability to a third party). Pls.' Opp'n 25.

"Section 541 is construed broadly to bring any and all of [a] debtor's property rights

within the bankruptcy court's jurisdiction and the umbrella of protections granted by the

Bankruptcy Code, and to promote the goal of equality of distribution." *Abboud v. Ground Round,*

*Inc. (In re The Ground Round, Inc.)*, 335 B.R. 253, 259 (B.A.P. 1st Cir. 2005), *aff'd*, 482 F.3d 15

(1st Cir. 2007) (citing *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.9 (1983)). The

question of whether an interest is "property of the estate" is a federal question to be decided by

federal law; however, courts must look to state law to determine whether and to what extent the

debtor has any legal or equitable interests in such property as of the commencement of the case.

*See Butner v. United States*, 440 U.S. 48, 54 (1979).

The Trustee indisputably has standing to assert causes of action that belong to the

Debtor's estate, including those causes of action arising under the Bankruptcy Code. *See, e.g.*, 11

U.S.C. §§ 541(a), 542, 544, 548, 704. In *Regan v. Vinick & Young (In re Rare Coin Galleries of*

32

*Am., Inc.)*, after affirming a trustee's ability to prosecute a debtor's prepetition claims, the First

Circuit distinguished such causes of action from those belonging to creditors, stating: "[c]auses

of action belonging to the debtor are included as property of the estate under 11 U.S.C. §

541(a)(1) (1982). The trustee, however, has no power to assert any claim on behalf of the

creditors when the cause of action belongs solely to them." 862 F.2d 896, 900–01 (1st Cir. 1988)

(internal citations omitted). The First Circuit has further explained that there are, nonetheless, a

subset of creditor claims that could be brought by a trustee, stating:

> It is common ground that when a cause of action belongs to the bankruptcy estate,
> the trustee has the exclusive right to assert it.
>
> Conversely, the trustee lacks standing to pursue claims that belong personally to
> the creditors. A court tasked with determining who can pursue a particular claim
> must look to the kind of harm alleged.
>
> If the claim is a general one, it is property of the estate. Put another way, when the
> alleged injury to a creditor is indirect or derives solely from an injury to the debtor,
> the claim is general. Claims are deemed personal, rather than general, when a
> creditor himself is harmed and no other claimant or creditor has an interest in the
> cause.

*City Sanitation, LLC v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.)*, 656 F.3d 82,

90 (1st Cir. 2011) (internal citations and quotation marks omitted).

In *Ontos*, the First Circuit determined in the context of approval of a settlement and

related releases sought by the trustee regarding certain claims brought by former officers on

behalf of the debtor that "[b]ecause the fraudulent transfer and breach of fiduciary duty claims

the trustee wishes to settle are derivative in nature, the same claims pursued against an alter ego

or successor corporation must be derivative in nature as well. Given that such derivative claims

are properly the property of the estate, the bankruptcy court did not err in finding that the trustee

had the power to settle them." 478 F.3d at 433.

33

With respect to fraudulent transfer claims generally, the Court noted:

> The Bankruptcy Code broadly defines the property of the estate to be comprised of all "legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). It is well established that a claim for fraudulent conveyance is included within this type of property.

478 F.3d at 431. The Court then recognized the similarity of the successor liability remedy to the fraudulent transfer remedy, and likewise determined the trustee could have asserted such claim and that it was not error to approve settlement of such a claim. *Id*. at 433 n.2 (holding that the particular alter ego claims settled by the trustee were property of the estate, while expressing no view on the contours of alter ego claims and generally acknowledging that "[t]he primary roadblock to finding the alter ego and successor liability claims to be part of the estate is that a corporation generally may not pierce its own veil").

Accordingly, even though a successor liability claim may not usually be part of a debtor's estate, *see, e.g., McCarthy v. Azure*, 22 F.3d 351, 363 (1st Cir. 1994), such a claim may, nonetheless, be part of the estate where a successor liability claim addresses generalized harm to all creditors and is so intertwined with other claims held by the estate such that it is a claim appropriately pursued by a trustee. *Cf. Ontos*, 478 F. 3d at 433; 5 COLLIER ON BANKRUPTCY ¶ 541.07 n.1 (16th ed. 2017) (noting that estate created pursuant to § 541(a) includes causes of action belonging to the debtor at the time the case is commenced and that "[t]his principle extends to actions based upon successor liability, so long as any recovery would accrue for the benefit of all creditors and not any specific creditor"); *see, e.g., Emoral, Inc. v. Diacetyl (In re Emoral, Inc.)*, 740 F.3d 875, 881 (3d Cir. 2014) *cert. denied sub nom.*, *Diacetyl Plaintiffs v. Aaroma Holdings*, LLC, 135 S. Ct. 436 (2014) (concluding that "the purpose of successor liability is to promote equity and avoid unfairness, and it is not incompatible with that purpose

34

for a trustee, on behalf of a debtor corporation, to pursue that claim" and affirming the court's

determination that the successor liability claim was "a generalized claim constituting property of

the estate").[17]

Because the alter ego and successor liability claims as alleged are sufficiently entangled

with other general, derivative-type claims asserted by the Trustee seeking recovery for the

collective benefit of all creditors as contemplated by *Ontos*, under the circumstances of this case

and based on the allegations in the Complaint, the Trustee has standing to pursue those claims.[18,]

---

[17] While other courts outside this jurisdiction have determined that "the argument that the corporation cannot bring an alter ego suit is an affirmative defense, which is not grounds for dismissal of the action at [the motion to dismiss] stage[,]" *Rosener v. Majestic Mgmt. (In re OODC, LLC)*, 321 B.R. 128, 136–37 (Bankr. D. Del. 2005), the First Circuit has taken a more liberal view of consideration of affirmative defenses in the context of a motion to dismiss under Civil Rule 12(b)(6), but, nonetheless, still requires such defense to be established with "certitude." *Rodi v. S. New England Sch. of Law*, 389 F.3d 5, 12 (1st Cir. 2004) (finding "[a]s a general rule, a properly raised affirmative defense can be adjudicated on a motion to dismiss so long as (i) the facts establishing the defense are definitively ascertainable from the complaint and the other allowable sources of information, and (ii) those facts suffice to establish the affirmative defense with certitude.").

[18] As previously noted in footnote 11 *supra*, neither party addresses whether, and to what extent, Delaware law may apply to the successor liability and alter ego claims because the Debtor is organized under the laws of Delaware, Compl. ¶ 18, or whether such claims are property of the estate because a debtor may assert such claims under Delaware law, *see generally* 11 U.S.C. § 541(a)(1); *Butner*, 440 U.S. at 54; *see also, e.g., First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 621 (1983) (holding generally that claims that involve the internal affairs of a corporation should be resolved in accordance with the law of the state of incorporation"); *Evans v. Multicon Constr. Corp.*, 574 N.E.2d 395, 400 (Mass. App. Ct. 1991) (determining whether to pierce corporate veil and relying on Restatement (Second) of Conflict of Laws § 188 (1969), wherein place of incorporation is only one of several factors to determine applicable law). Courts applying Delaware law have recognized that, in certain circumstances, Delaware corporations may bring actions seeking to pierce their own veil or impose successor liability, s*ee, e.g., N.J. Dep't of Envtl. Prot. v. Occidental Chem. Corp. (In re Maxus Energy Corp.)*, 571 B.R. 650, 658 (Bankr. D. Del. 2017) (holding that under Delaware law, a wholly-owned corporate subsidiary can, in fact, pierce its own corporate veil and hold liable a third-party non-debtor); *Geyer v. Ingersoll Publ'n Co.*, 621 A.2d 784, 793 (Del. Ch. 1992) (finding that Delaware law permits a court to pierce the corporate veil of a company "where there is fraud or where [it] is in fact a mere instrumentality or alter ego of its owner"), such that, alternatively, those claims would have constituted property of the estate as of the petition date, s*ee, e.g, Butner*, 440 U.S. at 54; *Emoral*, 740 F.3d at 880 (concluding "other courts applying New York and New Jersey law have held that state law causes of action for successor liability, just as for alter ego and veil-piercing causes of action, are properly

[19] Accordingly, the Court denies Moog's request to dismiss this Count as to the Trustee, finding

that he has standing and that the claim has been appropriately pleaded to survive dismissal

pursuant to Civil Rule 12(b)(6).[20]

### f.   Count XI: Violation of Article 9 of the UCC

To the extent Moog is determined to be a lender to the Debtor, the Trustee brings an

alternative claim for violation of Article 9 of the UCC, alleging that Moog failed to use

commercially reasonable efforts with respect to the secured party sale it conducted and through

which it acquired all of the Debtor's assets for a credit bid of $2.1 million.

Under New York, Massachusetts, or Delaware law,[21] "[e]very aspect of a disposition of

---

characterized as property of the bankruptcy estate"); *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 703–04 (2d Cir. 1989) (stating "[w]e believe that, under Ohio law, a corporation would be able to assert an alter ego cause of action against its parent corporation. The cause of action therefore becomes property of the estate of a bankrupt subsidiary, and is properly asserted by the trustee in bankruptcy"); *Sterne Agee Grp., Inc. v. Robinson (In re Anderson & Strudwick, Inc.)*, No. 14-3175, 2015 WL 1651146, at *5 (Bankr. E.D. Va. Apr. 8, 2015) (acknowledging that "**weight of authority outside of this Circuit supports the conclusion that a successor liability claim constitutes property of the bankruptcy estate under Bankruptcy Code § 541(a)(1), which a trustee has standing to pursue on behalf of all creditors**"); *OODC*, 321 B.R. at 136 (holding that the bankruptcy trustee had standing to pursue successor liability claims because the claims were general and common to all creditors, noting that "most other courts have found that the trustee in bankruptcy has standing to bring successor liability (or alter ego) suits on behalf of all creditors.").

[19] Some authorities have advocated a reading of § 544(a) that would give to the trustee all "rights and powers" of any creditor as of the commencement of the case and consequently the right to assert any creditor causes of action. *See* Richard J. Mason & Patricia K. Smoots, *When Do the Creditors' Shoes Fit?: A Bankruptcy Estate's Power to Assert the Rights of a Hypothetical Judgment Creditor*, 91 AM. BANKR. L.J. 435, 460–62 (2017) This Court need not consider that interpretation of the statute given the basis for its ruling. The Court again notes that there is no contention that Becana would not have standing to bring these claims if not asserted by the Trustee.

[20] Becana may not presently possess standing where the Trustee has asserted these claims, but the parties have not sought to dismiss Becana at this juncture.

[21] The Complaint does not specify which state's law is applicable to the Trustee's Article 9 claim. While Moog's Motion cites to the Massachusetts UCC, the Security Agreement provides that New York law governs the agreement. Mot. Ex. 1, § 7(i). The Debtor was organized pursuant to Delaware law. In their

collateral, including the method, manner, time, place, and other terms, must be commercially reasonable." N.Y. U.C.C. § 9–610(b); M.G.L. ch. 106, § 9–610(b); 6 Del. C. § 9–610(b). The burden would ultimately be on Moog to prove commercial reasonableness. *See, e.g, In re Replogle*, 929 F.2d 836, 838 (1st Cir. 1991). The term "commercially reasonable" is not specifically defined by the UCC and has been held to mean "that a qualifying disposition must be made in the good faith attempt to dispose of the collateral to the parties' 'mutual best advantage.'" *Long Island Trust Co. v. Williams*, 507 N.Y.S.2d 993, 997 (N.Y. Civ. Ct. 1986) (citing *Cent. Budget Corp. v. Garrett*, 368 N.Y.S.2d 268, 285 (N.Y. App. Div. 1975)); *see also, Solfanelli v. CoreStates Bank, N.A.*, 203 F.3d 197, 200 (3d Cir. 2000) (explaining that every aspect of the sale of collateral must be characterized by avoidance of loss, good faith, and an effective realization); *In re Inofin, Inc.*, 455 B.R. 19, 46 (Bankr. D. Mass. 2011) (citing M.G.L. ch. 106, § 9–102(43) and holding "'good faith' is a related concept and means 'honesty in fact and the observance of reasonable commercial standards of fair dealing'"). In addition to the price obtained in the context of the sale, courts consider several other factors to determine whether a transaction is commercially unreasonable given the UCC's focus on the steps taken by the secured party in conducting the sale to achieve the highest price rather than the price itself. *See* N.Y. U.C.C. § 9–610(b) ("the method, manner, time, place, and other terms must be commercially reasonable"); M.G.L. ch. 106, § 9–610(b) (same); 6 Del. C. § 9–610(b) (same). Factors generally include:

---

Brief in support of their objection to the Motion, the Plaintiffs cite to New York law with respect to Count XI. The distinction is not material, however, as New York, Massachusetts, and Delaware law appears to be materially the same with respect to the standards developed for commercial reasonableness. *Compare* N.Y. U.C.C. § 9-610(b) *with* M.G.L. ch. 106 § 9-610(b) *and* 6 Del. C. § 9-610(b).

> [1] whether the timing between the sale and notice was too short or too long; [2] whether the seller advertised the sale; [3] whether the sale was in a proper place; [4] whether the seller permitted necessary inspections by prospective bidders; [5] whether the seller performed necessary repairs; and [6] whether the seller held the sale at the same time and location as advertised.

*Wells Fargo Bus. Credit v. Environamics Corp.*, 934 N.E.2d 283, 289 (Mass. App. Ct. 2010) (citing 4 White & Summers, Uniform Commercial Code § 34–11, 464–466 (6th ed. 2010)); *see also Hicklin v. Onyx Acceptance Corp.*, 970 A.2d 244, 252 (Del. 2009) (stating that "[a]lthough obtaining a satisfactory price is the purpose of requiring a secured party to resell collateral in a commercially reasonable way, price is only one aspect" and explaining that a sale "to the highest bidder at a poorly publicized, sparsely attended, and inconveniently located auction would not be meaningful; but a sale to the highest bidder at a highly-publicized, well-attended auction run by a highly-regarded auctioneer in a convenient location would be"). "In this regard, adjudication of the 'commercially reasonable' standard . . . produces inquiry into the competence and aggressiveness of the marketing effort." *Environamics*, 934 N.E.2d at 289 (citing *Pemstein v. Stimpson*, 630 N.E.2d 608, 614 (Mass. App. Ct. 1994)). With respect to New York law, "[t]he New York Court of Appeals has implicitly validated two tests for determining whether a disposition of property was commercially reasonable under [Article 9], one focusing on the procedures employed, and the other on maximizing resale price." *European Am. Bank v. Sackman Mortg. Corp. (In re Sackman Mortg. Corp.)*, 158 B.R. 926, 936 (Bankr. S.D.N.Y. 1993) (describing the tests employed as follows: "[t]he procedural test examines the methods employed to dispose of the property [and i]f the secured creditor makes certain that conditions of the sale, in terms of the aggregate effect of the manner, method, time, place and terms employed conform to commercially reasonable standards, it should be shielded from the sanctions

38

contained in Article 9 [and t]he fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner"; whereas the "proceeds test . . . declare[s] that optimizing resale price is the prime objective of the code's default mechanisms and that the other factors listed are merely designed to ensure that the highest price is achieved.") (citations and internal quotations omitted).

At base, the inquiry into commercial reasonableness is a fact-intensive one that requires an examination of all circumstances of the sale. *See, e.g., Matter of Excello Press, Inc.*, 890 F.2d 896, 905 (7th Cir. 1989) ("[w]hether a sale was commercially unreasonable is, like other questions about reasonableness, a fact-intensive inquiry; no magic set of procedures will immunize a sale from scrutiny") (internal quotations omitted). Such an inquiry does not fit easily with the standard applicable for determination of motions to dismiss, particularly where there is no uniform test as to the form of credit agreement which may alter the standards for fulfilling what may considered commercially reasonable. While parties may not waive the requirement that a disposition of collateral be commercially reasonable, § 9–603 of the UCC expressly provides that "[t]he parties may determine by agreement the standards measuring the fulfillment of the rights of a debtor . . . and the duties of a secured party . . . if the standards are not manifestly unreasonable." N.Y. U.C.C. § 9–603; M.G.L. ch. 106, § 9–603; 6 Del. C. § 9-603. Similar to the lack of consensus on what is "commercially reasonable," existing case law fails to establish a uniform test for what is "manifestly unreasonable" in the foreclosure standards context.

The Trustee has pleaded sufficient facts to support a claim under Article 9 of the UCC,

39

including that: (i) Moog did not employ a process intended to generate a reasonable sale price

and the sale price obtained was substantially less than that which the parties had previously

valued the Debtor's assets and less than the assets would have been appraised for if an appraisal

conducted; (ii) Moog conducted the auction sale as a formality to consolidate its control the

Debtor's assets; (iii) Moog failed to adequately market the property; (iv) Moog was the sole

bidder at a sale conducted on only fourteen days' notice and other potential purchasers were

deprived from acquiring the Debtor's assets; and (v) Moog deprived the Debtor of six-month

"runway" to obtain alternative financing and the Debtor was damaged as a result. Compl. ¶ 95.

Accordingly, the Court will deny the Motion as to Count XI.

### g.  Count XII: Violation of M.G.L. ch. 93A

Pursuant to Count XII of the Complaint, the Trustee alleges a violation of section 11 of

M.G.L. ch. 93A, which provides for a cause of action to "[a]ny person who . . . suffers any loss

of money or property . . . as a result of the use or employment by another person who engages in

any trade . . . of an unfair method of competition or an unfair or deceptive act or practice."

M.G.L. ch. 93A, § 11. To survive dismissal of a ch. 93A claim, the Trustee is required to have

alleged sufficient facts to demonstrate that Moog used or employed an unfair or deceptive act or

practice that: "(1) falls within the penumbra of some common-law, statutory, or other established

concept of unfairness; (2) is immoral, unethical, oppressive, or unscrupulous; and (3) causes

substantial injury to [consumers or other businesspersons]." *FAMM Steel, Inc. v. Sovereign

Bank*, 571 F.3d 93, 107 (1st Cir. 2009) (citations and internal quotation marks omitted).

Furthermore, a ch. 93A claim may not be brought "unless the actions and transactions

constituting the alleged unfair method of competition or the unfair or deceptive act occurred

40

primarily and substantially in the commonwealth." M.G.L. ch. 93A, § 11. For purposes of a

motion to dismiss, a "section eleven cause of action . . . should survive a 'primarily and

substantially' challenge so long as the complaint alleges that the plaintiff is located, and claims

an injury in Massachusetts." *Back Bay Farm, LLC v. Collucio*, 230 F. Supp. 2d 176, 188 (D.

Mass. 2002); *see also Amcel Corp. v. Int'l. Exec. Sales, Inc.*, 170 F.3d 32 (1st Cir. 1999). The

claim occurred "primarily and substantially" in Massachusetts for purposes of the Motion as the

Debtor is located in Massachusetts and the alleged damages manifested themselves at the

Debtor's principal place of business.

Moog asserts that, because the Debtor had defaulted on its quarterly interest payments

under the Note, it was entitled to enforce its rights under the express terms of the financing

documents such that the Trustee cannot allege adequate facts regarding ch. 93A claim. The

Trustee, however, has alleged sufficient facts to raise the specter of coercion and unfair or

deceptive practices when the totality of the alleged circumstances is considered. In the

Complaint, the Trustee made the following allegations in direct support of its claim: the parties

were engaged in conduct of trade or commerce in Massachusetts; the parties' written agreements

and business concerned property and business operations in Massachusetts; and the Debtor

suffered losses to property and business in Massachusetts. The Trustee further alleges that Moog:

(i) having agreed to a six-month "runway" if it did not exercise its option to acquire the Debtor,

it changed the deal and expedited its ability to take over control of the Debtor through the

Surrender Agreement, "strong-arming" the Debtor into signing the Surrender Agreement; (ii)

used its knowledge of the Debtor's financial condition and its role in the Debtor's operation in a

scheme to acquire the business of the Debtor; (iii) exercised improper control of the debtor in

41

furtherance of a loan to own scheme; and (iv) effected a scheme that enabled it to acquire the Debtor's assets for less than fair value. Compl. ¶¶ 32, 34, 38, 100, 101. These allegations set forth in the Complaint, and reasonable inferences therefrom, support a plausible claim that Moog engaged in unfair or deceptive acts and/or practices that were potentially willful and knowing and violations of M.G.L. ch. 93A.

While the Trustee may ultimately fall short of establishing that Moog's conduct was within "'the penumbra of some common law, statutory, or other established concept of unfairness' or was 'immoral or unethical, oppressive or unscrupulous,'" *see, e.g., DeGiacomo v. Raymond C. Green, Inc. (In re Inofin Inc.)*, 512 B.R. 19, 87 (Bankr. D. Mass. 2014) (quoting *Levings v. Forbes & Wallace, Inc.*, 396 N.E.2d 149, 153 (Mass. App. Ct. 1979)), the claim survives a request for dismissal at this stage.

### III.        Conclusion

In view of the foregoing, taking the Complaint's well-pleaded, non-conclusory allegations as true and drawing all reasonable inferences in favor of the Plaintiffs to determine if they plausibly narrate a claim for relief, Moog's Motion is granted in part as to Count II, which count is dismissed, and denied in part with respect to Counts I and III–XII. A separate order shall enter in accordance with this decision.

Dated: December 8, 2017                              By the Court,


_____

Christopher J. Panos
United States Bankruptcy Judge